Filed 6/8/20 (unmodified opinion and publication/first modification order attached)

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

|  |  |
|---|---|
| DELTA STEWARDSHIP COUNCIL CASES. | C082944 & C086199<br><br>(JCCP No. 4758; Sacramento Super. Ct. case Nos. 34-2013-80001500, 34-2013-80001530, 34-2013-80001534; San Francisco Super. Ct. case Nos. CPF-13-513047; CPF-13-513048, CPF-13-513049.)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

        APPEAL from a judgment of the Superior Court of Sacramento County, Michael P. Kenny, Judge.  Affirmed in part and reversed in part.

_____

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of the Discussion entitled "THE FEES CASE."

Best Best & Krieger, Charity Schiller, Stefanie Morris, Jennifer Lynch for Plaintiffs and Appellants State Water Contractors, Alameda County Flood Control and Water Conservation District Zone 7, and San Bernardino Valley Municipal Water District.

Marcia L. Scully, Adam C. Kear, Robert C. Horton, and Stefanie Morris for Plaintiff and Appellant The Metropolitan Water District of Southern California.

Brunick, McElhaney & Kennedy, William J. Brunick, and Leland McElhaney for Plaintiffs and Appellants Mojave Water Agency and Antelope Valley-East Kern Water Agency.

Stanly T. Yamamoto, District Counsel, and Anthony T. Fulcher, Assistant District Counsel for Plaintiff and Appellant Santa Clara Valley Water District.

Kronick, Moskovitz, Tiedemann & Girard, Daniel J. O'Hanlon, Rebecca Harms, and Carissa M. Beecham for Plaintiffs and Appellants San Luis & Delta-Mendota Water Authority and Westlands Water District.

Pioneer Law Group, Andrea A. Matarazzo; and Jon D. Rubin, General Counsel for Plaintiff and Appellant Westlands Water District.

Rebecca R. Akroyd, General Counsel for Plaintiff and Appellant San Luis & Delta-Mendota Water Authority.

Freeman Firm, Thomas H. Keeling; Law Office of John H. Herrick, John H. Herrick; Mohan, Harris, Ruiz, Wortmann, Perisho & Rubino, S. Dean Ruiz; Nomellini, Grilli & McDaniel, Dante John Nomellini, Dante John Nomellini, Jr., and Daniel A. McDaniel for Plaintiffs and Appellants Central Delta Water Agency, South Delta Water Agency, Lafayette Ranch, Inc., and Cindy Charles.

Michael B. Jackson for Plaintiffs and Appellants California Sportfishing Protection Alliance, California Water Impact Network, and AquAlliance, Friends of the River and Restore the Delta.

Soluri Meserve and Osha R. Meserve for Plaintiff and Appellant Local Agencies of the North Delta.

E. Robert Wright for Plaintiff and Appellant Friends of the River.

John Buse for Plaintiff and Appellant Center for Biological Diversity.

Law Offices of Michael A. Brodsky and Michael A. Brodsky for Plaintiff and Appellant Save the California Delta Alliance.

Xavier Becerra, Attorney General, Daniel A. Olivas, Assistant Attorney General, Deborah M. Smith, Supervising Deputy Attorney General, Jeremy Brown, Daniel L. Siegel, Matthew Struhar, Deputy Attorneys General; Shute, Mihaly & Weinberger, Ellen J. Garber, Gabriel M.B. Ross, and Sarah H. Sigman for Defendants and Appellants Delta Stewardship Council.

Law Offices of Stephan C. Volker, Stephan C. Volker, and Alexis E. Krieg for Plaintiffs and Respondents North Coast Rivers Alliance, Pacific Coast Federation of Fishermen's Associations, San Francisco Crab Boat Owners Association, and Winnemem Wintu Tribe.

THE COURT:

It is ordered that the opinion filed herein on April 10, 2020, and modified and certified for partial publication on May 12, 2020, be modified as follows:

1.  On page 5, following the heading "**Factual Background**" and immediately preceding the subheading "*The Delta, Its Ecosystem, and California's Water Supply*" the following paragraph is added:

> The information in this section is largely drawn from the statutes added by the Delta Reform Act, the Delta Plan, and the 2008 Delta Vision Strategic Plan (Strategic Plan).  The remaining information was taken from various documents in the administrative record.

2.  On page 6, in the first full paragraph beginning with "The Delta is the terminus" the fifth sentence is modified to delete the words "It extends" and add "The Delta and Suisun Marsh estuary extend" in its place.  As modified this sentence now reads:

> The Delta and Suisun Marsh estuary extend westward to the Golden Gate and southward to San Jose.

3

3.  On page 10, in the first full paragraph beginning with "Approximately half of the water" the second sentence is modified to delete the word "some" and replace it with "much", and delete the phrase "the diversion of water" and replace it with the words "this diversion".  As modified this sentence now reads:

> While much of this diversion occurs at points upstream, before the Sacramento and San Joaquin Rivers reach the Delta, the last and largest draws take place in the Delta itself.

4.  On page 11, in the last full paragraph beginning with "After many years of slow decline," the third sentence and attached footnote 9 are deleted, which will require renumbering of all subsequent footnotes.  The following is inserted in its place:

> The list of causes negatively affecting the Delta ecosystem begins, but does not end, with all the water withdrawals, which have been characterized as a "kind of tax that leaves the [Delta] [eco]system in a condition of chronic drought.  The specific, peculiar manner in which the last large gulps of water are withdrawn adds to the ecological cost."

5.  On page 15, in the first sentence of the first full paragraph beginning with "In 2008, the Task Force" the words "Delta Vision Strategic Plan" and the following parentheses around the words "(Strategic Plan)" are deleted.  As modified this sentence now reads:

> In 2008, the Task Force presented its findings and recommendations in its Strategic Plan.

This modification does not change the judgment.  The petition for rehearing filed by

Water Contractors on June 2, 2020, is denied.

FOR THE COURT:


  /s/
————————————————————
RAYE, P. J.


  /s/
————————————————————
HULL, J.


  /s/
————————————————————
BUTZ, J.

Filed 4/10/20; Modified and certified for partial publication 5/12/20 (order attached) (unmodified opinion and publication/first modification order)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| DELTA STEWARDSHIP COUNCIL CASES. | C082944 & C086199<br><br>(JCCP No. 4758; Sacramento Super. Ct. case Nos. 34-2013-80001500, 34-2013-80001530, 34-2013-80001534; San Francisco Super. Ct. case Nos. CPF-13-513047; CPF-13-513048, CPF-13-513049.) |

This case concerns the management of the Sacramento-San Joaquin Delta (Delta), a critically important natural resource for California and the nation (Wat. Code, § 85002).[1] It is the most valuable estuary and wetland ecosystem on the west coast of North and South America, and is the hub of California's water delivery system. (*Ibid*.) It is endowed with many invaluable and unique resources of major statewide significance,

---

[1] Unless otherwise specified, undesignated statutory references are to the Water Code.

1

including highly productive agriculture, recreational assets, fisheries, and wildlife environment. (§ 12981, subds. (a), (b).) In addition, the economies of major regions of the state depend on the ability to use water within the Delta watershed or to import water from the Delta watershed. More than two-thirds of California residents and more than two million acres of highly productive farmland receive water exported from the Delta watershed. (§ 85004, subd. (a).) Water diverted from the Delta watershed has made the Central Valley the fruit basket and salad bowl of the nation. Unfortunately, the Delta is not doing so well. After years of slow decline, the Delta's watery ecosystem has gone critical.

In California, the conflicts over water are legendary. At the heart of California's water troubles are scarcity of supply and competing demands—in particular, conflict with the water needs of the ecosystem. This dynamic of conflict characterizes the essential debate over management of the Delta. Due to ecosystem decline and increasing demand for limited water resources, management of the Delta has been the subject of considerable, and oftentimes intense, review, planning, and litigation. In 2009, after decades of conflict and unsuccessful efforts to comprehensively address the many problems and challenges facing the Delta, the Legislature found and declared that the "Delta watershed and California's water infrastructure are in crisis and existing Delta policies are not sustainable," and that "[r]esolving the crisis requires fundamental reorganization of the state's management of Delta watershed resources." (§ 85001, subd. (a).) In response to this crisis, the Legislature enacted the Sacramento-San Joaquin Delta Reform Act of 2009 (§ 85000 et seq.) (Delta Reform Act or Act). As part of the Act, the Legislature created the Delta Stewardship Council (Council) as an independent agency of the state (§ 85200, subd. (a)) and charged it with adopting and implementing a legally enforceable "Delta Plan," a comprehensive, long-term management plan for the Delta that furthers two "coequal goals"—"providing a more reliable water supply for California

and protecting, restoring, and enhancing the Delta ecosystem" (§§ 85001, subd. (c), 85054, 85059, 85300, subd. (a)).

Following the preparation of a program-level environmental impact report (PEIR) pursuant to the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.) (CEQA), the Council adopted the Delta Plan in May 2013, which includes a set of recommendations and regulatory policies to achieve the coequal goals. The regulatory policies were subsequently approved as regulations by the Office of Administrative Law, and are currently codified at sections 5001-5016 of title 23 of the California Code of Regulations. Thereafter, seven lawsuits were filed by various groups (e.g., water exporters, in-Delta water users, environmental organizations) challenging the validity of the Delta Plan, the Delta Plan regulations, and the PEIR for the Delta Plan. The lawsuits were based primarily on alleged violations of the Delta Reform Act, the Administrative Procedures Act (Gov. Code, § 11340 et seq.) (APA), and CEQA. Each lawsuit sought a writ of mandate commanding the Council to vacate and set aside the Delta Plan and the Delta Plan regulations, and to rescind its certification of the PEIR.

After the lawsuits were coordinated into one proceeding in Sacramento County Superior Court,[2] the trial court issued written rulings in May and July 2016 collectively rejecting the legal challenges predicated on violations of the Delta Reform Act and the

---

[2] The coordinated proceeding consisted of the following cases: *San Luis Delta Mendota Water Authority, et al. v. Delta Stewardship Council* (Sacramento Super. Ct. case No. 34-2013-80001500); *State Water Contractors, et al. v. Delta Stewardship Council* (Sacramento Super. Ct. case No. 34-2013-80001530); *North Coast Rivers Alliance, et al. v. Delta Stewardship Council* (Sacramento Super. Ct. case No. 34-2013-80001534); *California Water Impact Network, et al. v. Delta Stewardship Council* (San Francisco Super. Ct. case No. CPF-13-513047); *Central Delta Water Agency, et al. v. Delta Stewardship Council* (San Francisco Super. Ct. case No. CPF-13-513048); *Save the California Delta Alliance v. Delta Stewardship Council* (San Francisco Super. Ct. case No. CPF-13-513049); and *City of Stockton v. Delta Stewardship Council* (San Joaquin Super. Ct. case No. 39-2013-00298188-CU-WM-STK).

APA, with a few exceptions involving under-regulation by the Council. As a consequence of the statutory violations, the trial court vacated and set aside the Delta Plan and any applicable regulations and ordered the Council to correct the identified deficiencies. The trial court did not reach the CEQA challenges, finding that there was no longer a proposed project with a PEIR subject to review under CEQA.

Following the entry of judgment, timely appeals were filed in each of the coordinated cases. In October 2017, the trial court granted a motion for attorney fees and costs filed by the petitioners in *California Water Impact Network, et al. v. Delta Stewardship Council* (San Francisco Super. Ct. case No. CPF-13-513047).[3] The petitioners in that case were awarded $94,698.33, representing a substantial reduction from the amount requested—$1,440,713. The petitioners timely appealed from the trial court's fee order. The Council filed a timely cross-appeal.

In April 2018, while the appeals were pending, the Council adopted amendments to the Delta Plan (Delta Plan Amendments) and certified the PEIR for the Delta Plan Amendments.[4] Due to a stipulated settlement, we dismissed the appeals taken from the judgment entered in one of the coordinated cases in April 2019.[5] In July 2019, we

---

[3] The Council has filed a motion asking us to take judicial notice of the trial court's fee order. We grant the Council's request. (Evid. Code, § 452, subd. (d).)

[4] Delta Alliance has filed a motion asking us to take judicial notice of various documents, including portions of the Delta Plan Amendments, portions of the PEIR for the Delta Plan Amendments, comment letters submitted to the Council during the environmental review process for the Delta Plan Amendments, and the Council's resolution adopting the Delta Plan Amendments and certifying the PEIR for the Delta Plan Amendments. We grant Delta Alliance's unopposed request for judicial notice. (Evid. Code, § 452, subds. (c), (h).)

[5] We dismissed the appeals taken from the judgment entered in *City of Stockton v. Delta Stewardship Council* (San Joaquin Super. Ct. case No. 39-2013-00298188-CU-WM-STK).

granted the request to consolidate the appeals filed in the attorney fee case (case No. C086199) with the appeals filed in the merits case (case No. C082944) for purposes of argument and disposition. Thus, currently before this court are the merits appeals filed in six of the seven coordinated cases and the appeals taken from the trial court's fee order.

In the merits case, we are asked to consider the validity of the trial court's rulings on legal challenges to the Delta Plan and Delta Plan regulations. The challenges based on violations of the Delta Reform Act can generally be summarized as asserting overregulation or under regulation by the Council in violation of the Act. In the fee case, we are asked to consider the validity of the trial court's attorney fee order. For the reasons stated below, we agree with the Council that the trial court erred in finding that it violated the Act by failing to adopt, as legally enforceable regulations, performance measure targets to achieve certain objectives of the Act. We also agree with the Council that the remaining issues raised in its appeal regarding the statutory violations found by the trial court have become moot due to the adoption of the Delta Plan Amendments. We find no error in the fee award and therefore affirm the trial court's fee order. In view of our mootness determination, we will reverse and remand the judgments entered in the four cases appealed by the Council in the merits case. These matters will be remanded to the superior court with directions to dismiss the portions that have become moot. In all other respects, we will affirm the judgment entered in each of the six coordinated cases before us in the merits case.

## FACTUAL AND PROCEDURAL BACKGROUND

**Factual Background**

*The Delta, Its Ecosystem, and California's Water Supply*

The Delta is the upstream, mostly freshwater portion of the San Francisco Estuary, the largest estuarine system on the west coast of the Americas and a distinct and valuable natural resource of vital and enduring interest to present and future residents of the state

5

and nation.  (See §§ 85002, 85022, subd. (c).)  It is a delicately balanced and interconnected estuary and wetland ecosystem of hemispheric importance that is home to a vast array of plants, fish, and wildlife, a critical stopping point on the Pacific flyway, and an agricultural and recreational center.  (See § 85022, subd. (c).)  It is essential to California's water supply because its rivers and the miles of natural and manmade sloughs and channels are the linchpin in how water is moved around California, primarily for urban and agricultural uses.  (See §§ 85002, 85004.)  The Legislature has declared that the Delta is a "natural resource of statewide, national, and international significance, containing irreplaceable resources, and it is the policy of the state to recognize, preserve, and protect those resources . . . for the use and enjoyment of current and future generations."  (Pub. Resources Code, § 29701.)  The Legislature has further declared that "the cities, towns, and settlements within the delta are of significant historical, cultural, and economic value and that their continued protection is important to the economic and cultural vitality of the region."  (Pub. Resources Code, § 29708.)

The Delta is the terminus for the Delta watershed, which is California's largest watershed, spanning more than 45,000 square miles (30 million acres).  The vast Delta watershed encompasses the western slopes of the Sierra Nevada, the eastern slopes of the coastal range, and the valleys that lie between these ranges.  The Delta is located at the western edge of the Central Valley and is formed by the confluence of the state's two largest rivers, the Sacramento from the north and the San Joaquin from the south.  It lies south of Sacramento and just east of where the Sacramento and San Joaquin Rivers enter Suisun Bay.  It extends westward to the Golden Gate and southward to San Jose.  Water in the Delta watershed starts as precipitation in the Sacramento River and San Joaquin River watersheds and, unless diverted or otherwise used, flushes San Francisco Bay and flows out to the ocean under the Golden Gate Bridge.

Variability and uncertainty are the dominant characteristics of California's water resources.  Precipitation is the primary source of California's water supply.  However,

6

precipitation in California varies greatly from year to year, as well as by season and where it falls geographically in the state. Most of California's precipitation occurs between November and April, yet most of the state's agricultural and urban water demand is in the summer and early fall. In addition, most of the precipitation falls in the mountains in the middle to northern half of the state, far from major population and agricultural centers. In California, most people live along the coast and in the southern portion of the state. In some years, the far north region of the state receives 100 inches or more of precipitation while the southernmost regions receive only a few inches. These basic characteristics of precipitation in California—seasonal timing and geography—and their fundamental disconnect with where and when Californians demand water provide the basic explanation for why management of the state's water resources is such a complicated and controversial matter.

The river systems flowing into the Delta drain about 40 percent of the land in California and carry about half of the state's total annual runoff. Prior to human settlement, the Delta was a great marsh, a continuous 700,000-acre shallow wetland with water covering the area for many months of the year. (See § 85003, subd. (a).) It was a dynamic floodplain and tidal marshland that provided a rich and complex mixture of habitat for diverse species of plants and animals. Approximately 400,000 acres of tidal wetlands and other aquatic habitats connected with several hundred thousand acres of nontidal wetlands and riparian forests. Flows of the Delta's rivers and tidal channels varied by season and year-to-year, sometimes pouring from the Sierra in great floods whose fresh waters overflowed wetlands and floodplains, and at other times declining as droughts shriveled rivers and brackish tidewaters (low salinity water created when salt water and fresh water mix together) pushed inland. Natural levees, created by deposits of sediment, allowed islands to emerge in the Delta during the dry summer months. Salinity would fluctuate, depending on the season and the amount of precipitation in any one year,

7

and the species in the Delta ecosystem evolved and adapted to this unique, dynamic system.  (§ 85003, subd. (a).)

Beginning in the late 1800's, more than 1,000 miles of levees were built in the Delta to drain wetlands for agricultural use and to protect islands from damaging floods. Channels were cut between sloughs or through islands to ease navigation and encourage drainage without regard to effects on the estuary.  Forests were cut and land leveled for farming.  Hundreds of thousands of acres of seasonally and tidally flooded wetlands were converted into fertile agricultural fields.  Eventually, nearly all of the rivers flowing to the Delta were dammed.

Over the years, the Delta landscape was transformed from primeval wetland complex to an archipelago of diked islands, where soils that once grew vast thickets of tules now yield bountiful corn, alfalfa, tomatoes, and many other crops.  Once a great marsh, the Delta is now a network of channels and sunken "islands"[6] that cover— together with the Suisun Marsh—about 839,640 acres (approximately 1,300 square miles).  Laid over those islands and channels is the infrastructure of a 21st century economy:  water supply conduits; major arteries of the state's electrical grid; natural gas fields, storage facilities, and pipelines; highways and railways; and shipping channels, all surrounded by an increasingly urban landscape.  The levees in the Delta serve to protect this infrastructure as well as the Delta's water supplies, farms, and communities.  They define the Delta's physical characteristics, influence the reliability of its water supplies and ecosystem health, and are critical to its residents, farms, businesses, cities, and legacy communities.

---

[6] The farming of peat-rich ground like the Delta leads to oxidation, the literal vanishing of soil, and thus to subsidence.  Many Delta islands now lie 15 feet or more below sea level and depend on aging dikes to prevent the water in adjacent channels from pouring in.

Today, the Delta is home to a wide variety of plant, fish, and wildlife species (including nonnative species and threatened or endangered native species), in addition to farms and communities.  More than half a million people live in the Delta and millions of people visit each year for boating, fishing, and other recreational activities on its 700 miles of channels.  While many people live in the Delta in cities, the Delta is largely rural.  Agriculture is the principal land use.  Approximately 57 percent of the Delta and Suisun Marsh (480,000 acres) support a highly productive agricultural industry that is valued at hundreds of millions of dollars annually.  More than 400,000 acres, or about 85 percent, of all farmland in the Delta is considered prime farmland with the best soils.  Because of the fertile peat soils and the moderating marine influence, the Delta's agriculture per-acre yields are almost 50 percent higher than the state's average.

The Delta also serves as the hub of California's water delivery system.[7]  (See § 85002.)  Two major water systems—the federal Central Valley Project (CVP) and California's State Water Project (SWP) divert water from the Delta and convey water previously stored in upstream reservoirs through the Delta, primarily for urban and agricultural uses in regions south of the Delta, including the San Francisco Bay Area,

_____

[7] " 'The history of California water development and distribution is a story of supply and demand.  California's critical water problem is not a lack of water but uneven distribution of water resources.  The state is endowed with flowing rivers, countless lakes and streams and abundant winter rains and snowfall.  But while over 70 percent of the stream flow lies north of Sacramento, nearly 80 percent of the demand for water supplies originates in the southern regions of the state.  And because of the semiarid climate, rainfall is at a seasonal low during the summer and fall when the demand for water is greatest; conversely, rainfall and runoff from the northern snowpacks occur in late winter and early spring when user demand is lower.  [Citation.]  Largely to remedy such seasonal and geographic maldistribution, while simultaneously providing relief from devastating floods and droughts, the California water projects were ultimately conceived and formed.' " (*State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674, 691.)

9

Central Valley, Central Coast, and Southern California.[8]  More than two-thirds of California residents (approximately 27 million people) and millions of acres of farmland rely on water diverted from the Delta watershed.  (See § 85004, subd. (a).)  This water plays a critical role in helping to sustain a major portion of the state's $1.9 trillion economy.  It fuels both local economies and those in export areas hundreds of miles away.

Approximately half of the water that historically flowed into and through the Delta is now diverted for human use, never reaching the sea.  While some of the diversion of water occurs at points upstream, before the Sacramento and San Joaquin Rivers reach the Delta, the last and largest draws take place in the Delta itself.  On the southeast edge of the Delta, two sets of mighty pumps (one each for the CVP & SWP) extract water into delivery systems that ship water throughout the state to users who hold water supply contracts with the State of California (SWP contracts) or federal government (CVP contracts).  Although the CVP and SWP were originally engineered to reliably deliver water to water service contractors and water rights holders without commensurate consideration for impacts on native species, the projects are currently operated in a coordinated fashion to optimize system efficiencies and to comply with state and federal regulatory restrictions that are intended to protect water quality and sensitive environmental resources through careful orchestration of reservoir releases upstream of the Delta and pumping from south of the Delta.  This close coordination has resulted in

---

[8]  In 1933, the Legislature approved the construction of the CVP, the nation's largest federal reclamation project.  The CVP is the biggest surface water storage and delivery system in California, with a geographic scope covering 35 of the state's 58 counties. (§ 85003, subd. (c).)  It includes 20 reservoirs, eight power plants, two pumping-generating plants, two pumping plants, and approximately 500 miles of major canals and aqueducts.  Approximately 25 years after the Legislature approved the CVP, California voters approved the construction of the SWP, the other major exporter of water from the Delta.

flexible operation of the Delta facilities to improve reliability of Delta water deliveries as well as to reduce system vulnerability to disruption.

*The Delta Problem*

The Delta is currently relied upon for many services and, as a result, is not meeting the demands of farmers and urban water users who want assurances of supply and, in some cases, more water. Nor is the Delta adequately serving the needs of fish and wildlife—some threatened or endangered species' numbers remain perilously low. And the Delta itself remains inherently flood-prone.

Over the years, human modifications to the Delta have promoted California's economy, but they have also imperiled its ecological health. The Delta is the only saltwater estuary in the world that is used as a conveyance system to deliver fresh water for export. This creates substantial water supply and ecosystem conflicts.

The economies of major regions of the state rely upon the ability to use water within the Delta watershed or to import water from the Delta watershed. Yet, these diversions harm the Delta ecosystem. The long-term impacts of these diversions, on the Delta and its watershed, in combination with many other factors, are causing native fisheries to decline.

After many years of slow decline, the condition of the Delta ecosystem, as measured especially by the population of wild salmon and other native fish, has gone critical. The Delta is currently in an "ecological tailspin." The list of causes negatively affecting the Delta ecosystem begins, but does not end, with the diversion of water by the CVP and SWP.[9] The Delta ecosystem is also harmed by, among other things, altered natural flows from human development (e.g., dams, levees), habitat loss from

---

[9] The water diverted by the CVP and SWP has been characterized as "a kind of tax that leaves the [Delta] [eco]system in a condition of chronic drought. The specific, peculiar manner in which the last large gulps of water are withdrawn adds to the ecological cost."

urbanization and agricultural use, degraded water quality from urban and agricultural pollution, invasive plant and animal species, and increased salinity from tidal saltwater intrusion[10] and agricultural drainage.

All of those who depend on or value the Delta are concerned. Delta residents and farmers face the possibility of floods from the east when the rivers flow strongly and of salinity intrusion from the west if they flow too feebly. Fishermen, both commercial and recreational, are worried about the future of salmon and other species. Water suppliers that export water from the Delta find those supplies insecure, subject to interruption by weather vagaries, levee failures, or pumping restrictions imposed in the desperate attempt to stem the decline of fish.[11]

The Delta is in a state of crisis because people have been unable to find balance in the tradeoffs among competing demands for its resources. Groups who seek to promote their own interests in the Delta include water exporters, water users within the Delta, upstream water users in the Delta watershed, environmentalists, and supporters of Delta

---

[10] " 'The major factor affecting water quality in the Delta is saltwater intrusion. Delta lands, situated at or below sea level, are constantly subject to ocean tidal action. Salt water entering from San Francisco Bay extends well into the Delta, and intrusion of the saline tidal waters is checked only by the natural barrier formed by fresh water flowing out from the Delta. [¶] 'But as fresh water was increasingly diverted from the Delta for agricultural, industrial and municipal development, salinity intrusion intensified, particularly during the dry summer months and in years of low precipitation and runoff into the river systems. One of the major purposes of [the CVP and SWP] was containment of maximum salinity intrusion into the Delta. By storing waters during periods of heavy flow and releasing water during times of low flow, the freshwater barrier could be maintained at a constant level.' [Citation.]" (*State Water Resources Control Bd. Cases, supra*, 136 Cal.App.4th at p. 694.)

[11] Due to the critical decline of native fish in the Delta, such as the Chinook salmon and Delta smelt, regulatory and court-ordered restrictions have been imposed on the operations of the CVP and SWP. As a consequence, water suppliers currently receive only a fraction of the water for which they hold supply contracts to export water under the CVP or SWP.

urbanization. Tradeoffs and integration define the Delta dilemma: water conveyance facilities that built strong urban and agricultural economies threaten ecosystem health. Water that is beneficial for fish is alive with plankton and organic material, but sources of drinking water are best in as pure a form as possible. The pollutants of upstream urban and agricultural uses cause problems for downstream fish and water diverters alike. The same oceangoing ships that opened the Central Valley to world trade also introduced nonnative species that alter the Delta ecosystem. High water flows that historically improved habitat and a diverse food web come with the threat of lost homes, flooded farmland, and disaster for Delta residents and the California economy.

The crisis in the Delta worsens each day, posing a higher and higher risk of ecological and economic disaster, including the collapse of California's water delivery system. Legal changes in recent decades, combined with growing societal awareness and scientific understanding of how water project operations impact ecosystem health, have had major implications for water operations in the Delta. The collision of changing societal values, growing demands for water deliveries from the Delta, and declining health of the Delta ecosystem have resulted in numerous complex and often bitter legal challenges that have increasingly shifted critical Delta water management decisions to the courts.

*Management of the Delta and the Delta Reform Act*

Sustainable management of the Delta is an exceedingly complex topic fraught with longstanding conflicts and challenges. Not unlike other policy areas, when it comes to natural resource issues, California has long attempted to manage symptoms rather than treat core problems.

For decades, California has treated individual problems and challenges facing the Delta without a comprehensive, systemwide approach. Since the mid-1980's, California has looked for ways to secure the natural and human values of the Delta while maintaining its place in the state's water plumbing. These efforts have generally started

13

in hope and ended in impasse. Currently, more than 200 federal, state, regional, and local agencies have responsibility for some aspect of the Delta. As each agency focuses on its specific mission, cooperation, collaboration, and cohesiveness have at times been elusive.

In recent years, environmentalists have turned to the courts, using the blunt tool of the federal Endangered Species Act (16 U.S.C. § 1531 et seq.) to force curtailment of water exports at certain times. In reaction, water suppliers south of the Delta have complained of "regulatory drought."

Prior to the Delta Reform Act and the creation of the Council, the most recent effort to resolve the demands of the competing interests on the Delta was the "CALFED" planning process. CALFED involved a consortium of state and federal agencies formed to develop and implement a long-term plan to improve ecosystem quality, water quality, water supply reliability, and reduce levee system vulnerability. However, the entity that eventually oversaw that plan—the California Bay-Delta Authority—lacked any meaningful authority to hold individual agencies and projects accountable to the plan, which was heavily dependent on goodwill, generous state and federal funding, and Delta conditions remaining generally as they had in the immediate past. Instead, goodwill and funding evaporated in the face of fiscal crisis, scientists learned more about looming effects of climate change and emerging stressors on the Delta, and competing interests turned back to the courts to force one viewpoint or the other.

In 2006, then-Governor Schwarzenegger created the Delta Vision Blue Ribbon Task Force (Task Force) and charged it with pointing the path forward from CALFED. The Governor directed the Task Force to seek input from a broad array of public officials, stakeholders, scientists, and engineers in drafting an independent public report setting forth its findings and recommendations regarding the sustainable management of the Delta, including recommendations regarding public policy changes, institutional changes, oversight, land use, and implementation authorities. The Task Force was charged with developing a strategic plan to pull the Delta out of its ecological tailspin by devising a

14

strategy to restore its environmental quality while ensuring a more reliable and stable water system.

In 2008, the Task Force presented its findings and recommendations in its Delta Vision Strategic Plan (Strategic Plan). At the outset, the Task Force recognized that the Delta has been the subject of decades of political deadlock. As a consequence, ecosystems have eroded, levees have deteriorated, fish populations have collapsed, and California's system of delivering water has become ever more precarious. The Task Force concluded that the Delta's state of crisis was compounded by the fact that more than 200 federal, state, and local agencies play some role in managing the Delta's resources, but no one is in charge. It found that "existing fragmentation of policies and projects guarantees continued failure in restoring the Delta ecosystem and in ensuring reliable water supplies for California." The Task Force therefore recommended that the Legislature create a new governance structure with needed legal authority and competencies to achieve the coequal goals of restoring the Delta's ecosystem and creating a more reliable water supply for California.

To accomplish the coequal goals, the Task Force recommended that policy makers: (1) legally acknowledge the coequal goals of restoring the Delta ecosystem and creating a more reliable water supply for California; (2) recognize and enhance the unique cultural, recreational, and agricultural values of the California Delta as an evolving place, which are critical to achieving the coequal goals; (3) restore the Delta ecosystem as the heart of a healthy estuary; (4) promote statewide water conservation, efficiency, and sustainable use; (5) build facilities to improve the existing water conveyance system and expand statewide storage, and operate both to achieve the co-equal goals; (6) reduce risks to people, property, and state interests in the Delta by effective emergency preparedness, appropriate land uses, and strategic levee investments; and (7) establish a new governance structure with the authority, responsibility,

15

accountability, sciences support, and secure funding to achieve these goals. The Task Force proposed 22 strategies and 73 actions for achieving the coequal goals.

The Task Force concluded that accomplishing the coequal goals would require the creation of a reliable water delivery system and Californians to become less dependent on water supply from the Delta. It further concluded that healing the Delta and creating a sustainable water supply would require a broad range of linked actions, including statewide efforts to conserve water and more responsible use of existing supplies. The Task Force noted that some of its recommendations would have greater success if integrated into statewide policies, and that while the strategies in the Strategic Plan would have effects over decades, conservation, water system efficiency, promoting regional self-sufficiency, and Delta ecosystem revitalization are the most likely actions to improve California's water future in the near term. The Task Force explained that, through the coequal goals and the related actions that go along with achieving them, the Strategic Plan attempted to present a vision and strategies to break through California's long years of water wars and begin to effectively address the future.

In response to the Strategic Plan and the Delta's state of crisis, the Legislature enacted the Delta Reform Act in 2009, finding and declaring that "existing Delta policies are not sustainable" and that "[r]esolving the crisis requires fundamental reorganization of the state's management of Delta watershed resources." (§ 85001, subds. (a), (b).) In enacting the Act, the Legislature stated that its intent was "to provide for the sustainable management of the . . . Delta ecosystem, to provide for a more reliable water supply for the state, to protect and enhance the quality of water supply from the Delta, and to establish a governance structure that will direct efforts across state agencies to develop a legally enforceable Delta Plan." (§ 85001, subd. (c).)

16

In a distinct departure from CALFED, the Legislature created the Council as an independent agency of the state[12] (§ 85200, subd. (a)) and charged it with adopting and implementing a legally enforceable "Delta Plan," a comprehensive, long-term management plan for the Delta that is built upon the principles of adaptive management[13] and uses the best available science to further two coequal goals— "providing a more reliable water supply for California and protecting, restoring, and enhancing the Delta ecosystem." (§§ 85300, subd. (a), 85302, subds. (a), (g), 85308, subds. (a), (f), 85054, 85059) The Legislature directed the Council to achieve the coequal goals "in a manner that protects and enhances the unique cultural, recreational, natural resource, and agricultural values of the Delta as an evolving place." (§ 85054.)

Consistent with the recommendations in the Strategic Plan, the Delta Reform Act provides that it is the policy of California to achieve the following objectives, which the Legislature declared are inherent in the coequal goals for management of the Delta: (1) "[m]anage the Delta's water and environmental resources and the water resources of the state over the long term"; (2) "[p]rotect and enhance the unique cultural, recreational, and agricultural values of the California Delta as an evolving place"; (3) "[r]estore the Delta ecosystem, including its fisheries and wildlife, as the heart of a healthy estuary and

---

[12] The Council consists of seven voting members. Four members are appointed by the Governor and confirmed by the Senate, one member is appointed by the Senate Committee on Rules, one member is appointed by the Speaker of the Assembly, and one member is the Chairperson of the Delta Protection Commission. (§ 85200, subd. (b).) Council members are required to "possess diverse expertise and reflect a statewide perspective." (§ 85202.) The Council is advised by a 10-member board of nationally and internationally prominent scientists, the Delta Independent Science Board. (§ 85280, subd. (a).)

[13] The Delta Reform Act defines " '[a]daptive management' " as "a framework and flexible decisionmaking process for ongoing knowledge acquisition, monitoring, and evaluation leading to continuous improvement in management planning and implementation of a project to achieve specified objectives." (§ 85052.)

wetland ecosystem"; (4) "[p]romote statewide water conservation, water use efficiency, and sustainable water use"; (5) "[i]mprove water quality to protect human health and the environment consistent with achieving water quality objectives in the Delta"; (6) "[i]mprove the water conveyance system and expand statewide water storage"; (7) "[r]educe risks to people, property, and state interests in the Delta by effective emergency preparedness, appropriate land uses, and investments in flood protection"; and (8) "[e]stablish a new governance structure with the authority, responsibility, accountability, scientific support, and adequate and secure funding to achieve these objectives." (§ 85020, subds. (a)-(h).)

The Delta Reform Act additionally provides that it is the policy of California "to reduce reliance on the Delta in meeting California's future water supply needs through a statewide strategy of investing in improved regional supplies, conservation, and water use efficiency." (§ 85021.) To achieve the objective of reduced reliance on the Delta, the Legislature mandated that "[e]ach region that depends on water from the Delta watershed shall improve its regional self-reliance for water through investment in water use efficiency, water recycling, advanced water technologies, local and regional water supply projects, and improved regional coordination of local and regional water supply efforts." (*Ibid*.)

The Delta Reform Act requires the Council to "establish and oversee a committee of agencies responsible for implementing the Delta Plan," (§ 85204)[14] which must further the restoration of the Delta ecosystem[15] and a reliable water supply (§ 85302,

---

[14] Each agency that is part of the committee must "coordinate its actions pursuant to the Delta Plan with the council and the other relevant agencies." (§ 85204.)

[15] The Delta Reform Act defines " '[r]estoration' " as "the application of ecological principles to restore a degraded or fragmented ecosystem and return it to a condition in which its biological and structural components achieve a close approximation of its

18

subd. (a)).  Specifically, section 85302 requires the Delta Plan to include measures that promote the following characteristics of a healthy Delta ecosystem:  (1) "[v]iable populations of native resident and migratory species"; (2) "[f]unctional corridors for migratory species"; (3) "[d]iverse and biologically appropriate habitats and ecosystem processes"; (4) "[r]educed threats and stresses on the Delta ecosystem"; (5) and "[c]onditions conducive to meeting or exceeding the goals in existing species recovery plans and state and federal goals with respect to doubling salmon populations."  (§ 85302, subd. (c)(1)-(5).)  In addition, the Delta Plan must include measures to promote a more reliable water supply that address all of the following:  (1) "[m]eeting the needs for reasonable and beneficial uses of water"; (2) "[s]ustaining the economic vitality of the state"; and (3) "[i]mproving water quality to protect human health and the environment." (§ 85302, subd. (d)(1)-(3).)  The Delta Plan must also include the following "subgoals and strategies" for restoring a healthy ecosystem:  (1) "[r]estore large areas of interconnected habitats within the Delta and its watershed by [the year] 2100"; (2) "[e]stablish migratory corridors for fish, birds, and other animals along selected Delta river channels"; (3) "[p]romote self-sustaining, diverse populations of native and valued species by reducing the risk of take and harm from invasive species"; (4) "[r]estore Delta flows and channels to support a healthy estuary and other ecosystems"; (5) "[i]mprove water quality to meet drinking water, agriculture, and ecosystem long-term goals"; (6) "[r]estore habitat necessary to avoid a net loss of migratory bird habitat and, where feasible, increase migratory bird habitat to promote viable populations of migratory birds."  (§ 85302, subd. (e)(1)-(6).)  The Legislature directed the Council to "consider, for incorporation into the Delta Plan, actions designed to implement the subgoals and strategies," (§ 85302, subd. (f)) and mandated that the Delta Plan include

natural potential, taking into consideration the physical changes that have occurred in the past and the future impact of climate change and sea level rise."  (§ 85066.)

19

"recommendations regarding state agency management of lands in the Delta" (§ 85302, subd. (h)).

The Legislature mandated that the Delta Plan:  (1) "promote statewide water conservation, water use efficiency, and sustainable use of water" (§ 85303); (2) "promote options for new and improved infrastructure relating to the water conveyance in the Delta, storage systems, and for the operation of both to achieve the coequal goals" (§ 85304); and (3) "attempt to reduce risks to people, property, and state interests in the Delta by promoting effective emergency preparedness, appropriate land uses, and strategic levee investments" (§ 85305, subd. (a)).

The Legislature also mandated that the Delta Plan meet all of the following requirements:  (1) "[b]e based on the best available scientific information and the independent science advice provided by the Delta Independent Science Board"; (2) "[i]nclude quantified or otherwise measurable targets associated with achieving the objectives of the Delta Plan"; (3) "[w]here appropriate, utilize monitoring, data collection, and analysis of actions sufficient to determine progress toward meeting the quantified targets"; (4) "[d]escribe the methods by which the council shall measure progress toward achieving the coequal goals"; (5) "[w]here appropriate, recommend integration of scientific and monitoring results into ongoing Delta water management"; and (6) "[i]nclude a science-based, transparent, and formal adaptive management strategy for ongoing ecosystem restoration and water management decisions."  (§ 85308, subds. (a)-(f).)  The Delta Plan must also include "performance measurements that will enable the council to track progress in meeting the objectives of the Delta Plan.  The performance measurements shall include, but need not be limited to, quantitative or otherwise measurable assessments of the status and trends in all of the following:  [¶] (a) The health of the Delta's estuary and wetland ecosystem for supporting viable populations of aquatic and terrestrial species, habitats, and processes, including viable populations of Delta fisheries and other aquatic organisms.  [¶] (b) The reliability of

20

California water supply imported from the Sacramento River or the San Joaquin River watershed." (§ 85211.)

In fulfilling its obligation to develop a Delta Plan that furthers the two coequal goals, the Delta Reform Act requires the Council to "consult with federal, state, and local agencies with responsibilities in the Delta." (§ 85300, subds. (a), (b).) Upon the request of the Council, all state agencies with responsibilities in the Delta must cooperate with the Council in developing the Delta Plan. (§ 85300, subd. (b).) The Delta Plan must include "subgoals and strategies to assist in guiding state and local agency actions related to the Delta." (§ 85300, subd. (a).) In developing the Delta Plan, the Legislature directed the Council to "consider each of the strategies and actions set forth in the Strategic Plan,"[16] and authorized the Council, in its discretion, to include in the Delta Plan any of the Strategic Plan's strategies or actions, and to identify specific actions that state or local agencies may take to implement the subgoals and strategies. (§ 85300, subd. (a).)

The Delta Reform Act authorizes the Council to "adopt regulations or guidelines as needed to carry out the powers and duties identified in [the Act]." (§ 85210, subd. (i).) It requires the Council to review the Delta Plan at least once every five years, and authorizes the Council, in its discretion, to revise the Delta Plan as it "deems appropriate." (§ 85300, subd. (c).) In complying with this requirement, the Council has the discretion to "request any state agency with responsibilities in the Delta to make recommendations with respect to revision of the Delta Plan." (§ 85300, subd. (c).)

---

[16] The Delta Reform Act defines the " 'Strategic Plan' " as "both the 'Delta Vision Strategic Plan' issued by the Delta Vision Blue Ribbon Task Force on October 17, 2008, and the 'Delta Vision Implementation Report' adopted by the Delta Vision Committee and dated December 31, 2008." (§ 85067.)

21

*The Delta Plan and the Council's Regulatory Authority*

In May 2013, following a comprehensive public process that allowed for input from organizations and individuals representing diverse interests and the preparation of a PEIR pursuant to CEQA, the Council unanimously adopted the Delta Plan. It is California's management plan for the Delta, prepared in consultation with and to be carried out by all agencies in the field: the State Water Resources Control Board (Water Board), ultimate arbiter of water rights and water quality; the California Department of Water Resources, the state's water planner and also operator of the SWP; the California Department of Fish and Wildlife, responsible for the welfare of the living system of the Delta; the Delta Protection Commission, which oversees land use and development on low-lying Delta islands; and many more agencies, state and local. In addition, federal agencies have promised their cooperation in carrying out the Delta Plan, including the U.S. Bureau of Reclamation, which runs the CVP, the U.S. Fish and Wildlife Service, the National Marine Fisheries Service, and the U.S. Army Corps of Engineers.

The Delta Plan, which spans nearly 300 pages, provides a detailed history, description, and analysis of the various problems and challenges facing the Delta. It is intended to be a foundational document that prioritizes actions and strategies in support of key objectives, such as the requirement to reduce reliance on the Delta to meet future water supply needs. It also restricts actions that may cause harm; serves as a guidebook for all plans, projects, and programs that affect the Delta; and calls for further investigation and focused study of specific issues.

The working parts of the Delta Plan are 73 recommendations and 14 policies.[17] The recommendations are nonregulatory but call out actions essential to achieving the

---

[17] The Delta Plan uses abbreviations to refer to its policies and recommendations. For example, Water Reliability Policy 1 is referred to as "WR P1." Similarly, Water Reliability Recommendation 1 is referred to as "WR R1."

coequal goals of the Delta Reform Act in a manner that protects and enhances Delta values as an evolving place. By contrast, the policies are regulatory in nature; state and local agencies proposing to undertake a "covered action"—a land use action as defined in the Act—must comply with the policies. (See §§ 85022, subd. (a), 85057.5, subd. (a).) The regulatory policies are enforced by the Council's appellate authority and oversight over covered actions. As explained by the Delta Plan, "In contrast to how many other governmental plans are implemented, the Council does *not* exercise direct review and approval authority over covered actions to determine their consistency with the regulatory policies in the Delta Plan. Instead, State or local agencies self-certify Delta Plan consistency, and the Council serves as an appellate body for those determinations." If the covered action is found to be inconsistent, the project may not proceed until it is revised so that it is consistent with the Delta Plan.

In addition to the 14 regulatory policies and 73 recommendations, the Delta Plan also identifies key issues for future evaluation by the Council and includes "performance measures" to evaluate whether the Delta Plan is achieving its objectives over time. Information learned from performance measures is an important part of how the Council determines when and how to update the Delta Plan as part of the adaptive management process.

As a general matter, the Delta Plan asks California and Californians to do six large things: (1) use water more efficiently in cities and on farms, and develop alternative, usually local, sources to improve and secure water supply; (2) get better at capturing and storing the surplus water that nature provides in the wettest years, building reserves that can be drawn on in dry ones; (3) provide adequate seaward flows in Delta channels, on a schedule more closely mirroring historical rhythms, to revitalize the Delta ecosystem; (4) bring back generous wetlands and riparian zones in the Delta for the benefit of fish and birds; (5) restrict new urban development to those peripheral areas already definitely earmarked for such growth, while supporting farming and recreation in the Delta's core,

23

to preserve the Delta as a place; and (6) floodproof the Delta, as far as feasible, mainly by improving levees and by providing more overflow zones where swollen rivers can spread without doing harm.

The Delta Plan speaks most directly to water suppliers that serve water within the Delta or export water out of the region. The Delta Plan requires all organizations that receive water from the CVP and SWP to do their share to reduce reliance on the Delta, setting specific reduction targets and actually putting measures in place. To meet the projected demands of California's growing population and achieve the goal of water supply reliability, the Delta Plan calls for an "integrated approach that includes increased water efficiency, local and regional diversification of water supplies, reduced reliance on water from the Delta, improved regional self-reliance, and concurrent improvements to storage and Delta infrastructure." The Delta Plan explains that Delta water supplies can be more reliable only when the Delta ecosystem is restored, which "will require new investment in water facilities and alternative supplies, not just regulation of water project operations or restoration of habitats for fish and wildlife."

Because the Delta Plan's 14 regulatory policies were intended to be enforceable regulations having the authority of law, the Council submitted them to the Office of Administrative Law as proposed regulations, as required under the APA. In August 2013, the Office of Administrative Law approved the 14 regulatory policies as regulations. (See Gov. Code, § 11349.1.)

The Delta Plan regulations, which are codified at sections 5001-5016 of title 23 of the California Code of Regulations, took effect on September 1, 2013. As previously indicated, the regulations do not propose or require the implementation of any specific project; rather, they establish legally enforceable standards that apply if a state or local public agency proposes to undertake a "covered action," which the Delta Reform Act defines as a plan, program, or project within the meaning of section 21065 of the Public

24

Resources Code[18] that meets all of the following conditions:  (1) "[w]ill occur, in whole or in part, within the boundaries of the Delta or Suisun Marsh"; (2) "[w]ill be carried out, approved, or funded by the state or a local public agency"; (3) "[i]s covered by one or more provisions of the Delta Plan"; and (4) "[w]ill have a significant impact on achievement of one or both of the coequal goals or the implementation of government-sponsored flood control programs to reduce risks to people, property, and state interests in the Delta."  (§ 85057.5, subd. (a); see §§ 85022, subd. (a), 85225.)  The Act identifies various actions that do not qualify as a covered action, including, among other things, a regulatory action of a state agency, routine maintenance and operation of the CVP and SWP, and routine maintenance and operation of a facility located, in whole or in part, in the Delta, that is owned or operated by a local public agency.  (§ 85057.5, subd. (b).)

Under the Delta Reform Act, state and local land use actions that qualify as covered actions must be consistent with the Delta Plan.  (§ 85022, subd. (a).)  The Act requires any state or local public agency that proposes to undertake a covered action to prepare a written certification of consistency prior to initiating the implementation of that covered action, with detailed findings as to whether the covered action is consistent with the Delta Plan, and then to submit that certification to the Council.  (§ 85225.)  "Any person who claims that a proposed covered action is inconsistent with the Delta Plan and, as a result of that inconsistency, the action will have a significant adverse impact on the achievement of one or both of the coequal goals . . . , may file an appeal with regard to a

---

[18]  Section 21065 of the Public Resources Code defines " '[p]roject' " as "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and which is any of the following:  [¶]  (a) An activity directly undertaken by any public agency.  [¶]  (b) An activity undertaken by a person which is supported, in whole or in part, through contracts, grants, subsidies, loans, or other forms of assistance from one or more public agencies.  [¶]  (c) An activity that involves the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies."

certification of consistency submitted to the council." (§ 85225.10, subd. (a).) If no appeal is filed, the state or local public agency may proceed to implement the covered action. (§ 85225.15.) If an appeal is filed, the Council must hold a hearing, unless it is determined that the issue raised on appeal is not within the Council's jurisdiction or does not raise an appealable issue. (§ 85225.20.)

After a hearing on an appealed action, the Council must make "specific written findings either denying the appeal or remanding the matter to the state or local public agency for reconsideration of the covered action based on the finding that the certification of consistency is not supported by substantial evidence in the record before the state or local public agency that filed the certification. Upon remand, the state or local agency may determine whether to proceed with the covered action. If the agency decides to proceed with the action or with the action as modified to respond to the findings of the council, the agency shall, prior to proceeding with the action, file a revised certification of consistency that addresses each of the findings made by the council and file that revised certification with the council." (§ 85225.25.) The Legislature mandated that the Council "adopt administrative procedures governing appeals," which are exempt from the rulemaking procedures of the APA. (§ 85225.30.)

**Procedural Background**

After the Delta Plan was adopted and the implementing regulatory policies were approved as regulations, seven lawsuits were filed in three different counties by various groups (e.g., water exporters [known generally as state (SWP) and federal (CVP) water contractors], Delta-based water users, environmental organizations) challenging the validity of the Delta Plan, the Delta Plan regulations, and the PEIR for the Delta Plan. The challenges were primarily based on alleged violations of the Delta Reform Act, the APA, and CEQA. The challenges to the Delta Plan and Delta Plan regulations were largely predicated on the theory that the policies and recommendations in the Delta Plan were inconsistent or in conflict with the Act, as they constituted unlawful overregulation

26

or under regulation by the Council. Each of the seven lawsuits sought a writ of mandate commanding the Council to vacate and set aside the Delta Plan and the Delta Plan regulations, and to rescind its certification of the PEIR. The lawsuits were eventually coordinated into one action in Sacramento County Superior Court.

After extensive briefing and argument, the trial court issued written rulings in May and July 2016, collectively rejecting most of the legal challenges to the Delta Plan predicated on violations of the Delta Reform Act and the APA, including all claims of overregulation. The court, however, concluded that the Delta Plan violated the Delta Reform Act by failing to: (1) include quantified or otherwise measurable targets associated with achieving certain Delta Plan objectives in violation of section 85308, subdivision (b); (2) provide a flow policy that includes quantified or otherwise measurable targets associated with restoring Delta flows and channels to support a healthy estuary and other ecosystems in violation of section 85302, subdivision (e)(4); and (3) promote options for new and improved infrastructure related to water conveyance in the Delta, storage systems, and for the operation of both to achieve the coequal goals, in violation of section 85304. The court further concluded that to the extent it had found that the Delta Plan regulations failed to comply with the Delta Reform Act with regard to quantified or otherwise measurable targets associated with achieving certain Delta Plan objectives, the Delta Plan regulations also violated the APA.

As a consequence of these statutory violations, the trial court vacated and set aside the Delta Plan and any applicable regulations, and ordered the Council to comply with section 85308's requirements by revising the Delta Plan and any applicable regulations to include quantified or otherwise measurable targets associated with achieving certain Delta Plan objectives; namely, reduced reliance on the Delta to meet California's future water supply needs, reduced environmental harm from invasive species, restoring more natural flows, and increased water supply reliability. The court also directed the Council to revise the Delta Plan and any applicable regulations to: (1) provide a flow policy that

27

includes quantified or otherwise measurable targets; and (2) promote options for water conveyance and storage systems.

In response to the Council's motion for clarification, the trial court issued a written order stating that, because "the Delta Plan is required to be legally enforceable, so must the section 85308 components." The court therefore clarified that the Council must adopt legally enforceable regulations that include quantified or otherwise measurable targets associated with achieving reduced reliance on the Delta to meet California's future water supply needs, reduced environmental harm from invasive species, restoring more natural flows, and increased water supply reliability. The court stated that it would not opine on whether the Council should revise its existing flow policy; instead, the court explained that "quantified or otherwise measurable targets must be part of a legally enforceable plan," and that "the Delta Plan fails to contain legally enforceable measurable targets concerning Delta Flows as required by section 85308." Finally, the court stated that the language in the Delta Reform Act calling upon the Council to revise the Delta Plan to " '*promote options* for new and approved infrastructure relating to the water conveyance in the Delta, storage systems, and for the operation of both to achieve the coequal goals' " does not implicate a regulatory requirement. As such, the court left it to the Council's discretion whether or not to " 'promote options' " by regulation or recommendation.

The trial court did not reach the merits of the CEQA challenges, finding that there was no longer a proposed project with a PEIR subject to review under CEQA. In declining to address the CEQA claims, the court reasoned, "The Court does not believe that piece-meal CEQA review is feasible under circumstances in which significant [Delta] Plan revisions are required." The court explained, "Because [the Council] must comply with its CEQA obligations following completion of a revised Delta Plan, Petitioners will have the opportunity to file CEQA challenges to this new certified document. Consequently, no party is deprived of the opportunity to present challenges to the [P]EIR at such time as a final project (Delta Plan) has been properly approved." The

28

parties stipulated that all CEQA claims would be preserved regardless of the outcome of any appeals. The parties further agreed that to the extent the Council relied on the PEIR in the future, it was required to adopt new CEQA findings and recertify the PEIR along with taking action on any other CEQA documentation it deemed appropriate, and that the Council was required to file a Notice of Determination that reflected the full extent of its reliance. These terms were included in the judgments entered by the trial court.

After judgment was entered in each of the seven coordinated cases, timely notices of appeal were filed. Thereafter, due to a stipulated settlement, we dismissed the appeals taken from the judgment entered in *City of Stockton v. Delta Stewardship Council* (San Joaquin Super. Ct. case No. 39-2013-00298188-CU-WM-STK).

In October 2017, the trial court granted a motion for attorney fees and costs filed by the petitioners in *California Water Impact Network, et al. v. Delta Stewardship Council* (San Francisco Super. Ct. case No. CPF-13-513047). The petitioners in that case were awarded $94,698.33, representing a substantial reduction from the amount requested—$1,440,713. The petitioners timely appealed from the trial court's fee order. The Council filed a timely cross-appeal.

In April 2018, while the appeals were pending, the Council adopted amendments to the Delta Plan (Delta Plan Amendments), and certified the PEIR for the Delta Plan Amendments. The validity of the Delta Plan Amendments and the PEIR for the Delta Plan Amendments is currently the subject of multiple new lawsuits.

In July 2019, we granted the request to consolidate the appeals filed in the fee case (case No. C086199) with the appeals filed in the merits case (case No. C082944) for purposes of argument and disposition.

## DISCUSSION

## THE MERITS CASE

### 1.0 General Principles

A regulation adopted by a state agency, like any agency action, comes to the court with a presumption of validity. (*Association of California Ins. Companies v. Jones* (2017) 2 Cal.5th 376, 389 (*ACIC*).) The standard of review governing a challenge to the validity of an administrative regulation is found in Government Code section 11342.2, which states: "Whenever by the express or implied terms of any statute a state agency has authority to adopt regulations to implement, interpret, make specific or otherwise carry out the provisions of the statute, no regulation adopted is valid or effective unless consistent and not in conflict with the statute and reasonably necessary to effectuate the purpose of the statute." Thus, "the rulemaking authority of the agency is circumscribed by the substantive provisions of the law governing the agency." (*Henning v. Division of Occupational Saf. & Health* (1990) 219 Cal.App.3d 747, 757.)

When a regulation is challenged on the ground that it is inconsistent or in conflict with the governing statute, the issue of statutory construction is a question of law on which a court exercises independent judgment. (*Western States Petroleum Assn. v. Board of Equalization* (2013) 57 Cal.4th 401, 415 (*Western States*).) The task of the reviewing court is to decide whether the regulation is within the scope of the authority conferred by the Legislature; if it is not, it is void. (*Engine Manufacturers Assn. v. State Air Resources Bd.* (2014) 231 Cal.App.4th 1022, 1034 (*Engine Manufacturers*).) "Regulations that alter or amend the statute, or enlarge or impair its scope, are invalid." (*ACIC, supra*, 2 Cal.5th at p. 390.) An administrative agency, however, is not limited to the exact provisions of a statute in adopting regulations to enforce its mandate; it is authorized to adopt regulations to " ' " ' "fill up the details" ' " ' " of the statutory scheme and to " ' "elaborate the meaning of key statutory terms." ' " (*GMRI, Inc. v. California Dept. of Tax & Fee Administration* (2018) 21 Cal.App.5th 111, 125 (*GMRI*).) "In

30

determining whether an agency has incorrectly interpreted the statute it purports to implement, a court gives weight to the agency's construction. [Citation.] 'Nevertheless, the proper interpretation of a statute is ultimately the court's responsibility.' " (*Western States, supra*, 57 Cal.4th at pp. 415-416.) " 'The rule giving weight to contemporaneous administrative construction is not evoked when the construction is incorrect.' " (*GMRI,* at p. 124.)

"When a regulation is challenged on the ground that it is not 'reasonably necessary to effectuate the purpose of the statute,' our inquiry is confined to whether the rule is arbitrary, capricious, or without rational basis [citation] and whether substantial evidence supports the agency's determination that the rule is reasonably necessary [citation]." (*Western States, supra*, 57 Cal.4th at p. 415.) The question of "reasonable necessity" generally implicates the agency's expertise; therefore it receives a much more deferential standard of review. (*Engine Manufacturers, supra*, 231 Cal.App.4th at pp. 1034-1035.)

The party challenging a regulation has the burden to show its invalidity. (*California School Bds. Assn. v. State Bd. of Education* (2010) 191 Cal.App.4th 530, 544.)

## 2.0    The Council

The Council contends that the trial court erred in concluding that the Delta Plan violated the Delta Reform Act. However, as a threshold matter, it claims that the controversy over whether the Delta Plan violated the Act in the ways identified by the trial court has largely become moot due to the adoption of the Delta Plan Amendments. According to the Council, the only issue that remains in controversy is whether the trial court erred in determining that the Act requires it to adopt legally enforceable regulations that include quantified or otherwise measurable targets (known as "performance measure targets") associated with achieving certain objectives of the Act. The Council maintains that this issue has not become moot because the Delta Plan Amendments, like the original Delta Plan, do not include performance measure targets as regulatory policies intended to

31

be legally enforceable regulations. Instead, the new performance measure targets in the Delta Plan Amendments, while more specific as required by the trial court, are in the form of recommendations.

We agree with the Council that the trial court erred in finding that the Delta Reform Act requires it to adopt performance measure targets as legally enforceable regulations. We also agree with the Council that the remaining controversy with respect to the various deficiencies in the Delta Plan identified by the trial court has become moot due to the adoption of the Delta Plan Amendments.

2.1    *Performance Measure Targets*

The Delta Reform Act requires that the Delta Plan include "quantified or otherwise measurable targets associated with achieving the objectives of the Delta Plan." (§ 85308, subd. (b).) In the trial court, two groups of petitioners argued that the Delta Plan was deficient because it failed to include such targets (i.e., performance measure targets) concerning certain Delta Plan objectives. The trial court agreed, concluding that the Delta Plan was invalid because it did not include any specific numeric goals that would be evaluated at a date certain to determine compliance with or progress towards achieving the following Delta Plan objectives: reduced reliance on the Delta to meet California's future water supply needs, reduced environmental harm from invasive species, restoring more natural flows, and increased water supply reliability. The court determined that the performance measure targets in the Delta Plan did not qualify as quantified or otherwise measurable targets because the targets called for achieving generalized nonnumeric goals, such as a " 'significant reduction,' " " 'progress toward,' " and a " 'downward' " trend.

In concluding that the Delta Plan was invalid, the trial court explained: "At the heart of the Court's analysis in these cases is section 85308, titled 'Requirements of the Delta Plan.' The first question is the degree to which this section informs the other provisions of the Delta Reform Act. The section's title suggests that the requirements it

32

lays out are the lens through which the Delta Plan must be viewed in determining Delta Reform Act compliance. Section 85308 provides that the 'Delta Plan *shall meet* all of the following requirements. . .' further bolstering a finding that the section provides a checklist for Delta Plan content. (emphasis added.) Accordingly, the Court performs its analysis of the Delta Plan with a view that a failure to include a section 85308 component is a failure to comply with section 85308, and a violation of the Delta Reform Act." After pointing out that subdivision (b) of section 85308 requires the Delta Plan to " 'include quantified or otherwise measurable targets associated with achieving the objectives of the Delta Plan,' " the court relied on the Oxford Dictionary and the Merriam-Webster Dictionary to determine that a " 'quantified' " or " 'otherwise measurable' " target is a numeric amount or goal that is identified.[19] The court then reasoned that in order to "satisfy [section 85308's] requirement of 'quantified or otherwise measurable targets' . . . any analysis of the Delta Plan must be informed by numeric goals that will be evaluated at a date certain to determine compliance or the measure of progress that has been accomplished. This is also consistent with the legislative direction that the Delta Plan be 'legally enforceable.' "

Following the trial court's ruling, the Council filed a motion seeking clarification as to whether it was required to adopt, or revise, its performance measure targets as regulations. In response, the trial court stated, in part, as follows: "Section 85001 requires the Delta Plan to be 'legally enforceable.' As section 85308 is the lens through which the Court views the Delta Plan, and the Delta Plan is required to be legally enforceable, so must the section 85308 components. Accordingly, the Court reiterates

---

[19] The trial court relied on the Oxford Dictionary and the Merriam-Webster Dictionary because the terms "quantified" and "otherwise measurable" are not defined in the Delta Reform Act, and because it could not locate any case law providing a definition of either term outside their ordinary meaning.

that [the Council] must revise the Delta Plan, and any applicable regulations to include quantified or otherwise measurable targets associated with achieving reduced Delta reliance, reduced environmental harm from invasive species, restoring more natural flows, and increased water supply reliability. Consequently, to achieve Delta Reform Act compliance with section 85308's requirements for quantifiable or otherwise measurable targets, [the Council] must adopt legally enforceable regulations. Merely providing recommendations to comply with section 85308 is insufficient."

We conclude the trial court erred in determining that the Delta Reform Act requires the Council to adopt performance measure targets as legally enforceable regulations. As relevant here, the Act requires the Council to adopt and implement a legally enforceable Delta Plan built upon the principles of adaptive management—i.e., "a framework and flexible decisionmaking process for ongoing knowledge acquisition, monitoring, and evaluation leading to continuous improvement in management planning and implementation . . . to achieve specified objectives" (§ 85052)— that uses best available science to further the two coequal goals of "providing a more reliable water supply for California and protecting, restoring, and enhancing the Delta ecosystem." (§ 85054; see also §§ 85001, subd. (c), 85300, subd. (a), 85302, subds. (a), (g), 85308, subds. (a), (f).) The Legislature mandated that the Delta Plan "include performance measurements that will enable the council to track progress in meeting the objectives of the Delta Plan. The performance measurements shall include, but need not be limited to, quantitative or otherwise measurable assessments of the status and trends in all of the following: [¶] (a) The health of the Delta's estuary and wetland ecosystem for supporting viable populations of aquatic and terrestrial species, habitats, and processes, including viable populations of Delta fisheries and other aquatic organisms. [¶] (b) The reliability of California water supply imported from the Sacramento River or the San Joaquin River watershed." (§ 85211.) In the statutory provision titled "Requirements," the Act provides that the Delta Plan must include "quantified or otherwise measurable

34

targets associated with achieving the objectives of the Delta Plan." (§ 85308, subd. (b).) In addition, the Delta Plan must, "[w]here appropriate, utilize monitoring, data collection, and analysis of actions sufficient to determine progress toward meeting the quantified targets," and "[d]escribe the methods by which the council shall measure progress toward achieving the coequal goals." (§ 85308, subds. (c), (d).)

The Delta Reform Act authorizes the Council "[t]o adopt regulations or guidelines as needed to carry out the powers and duties identified in [the Act]." (§ 85210, subd. (i).) It requires the Council to review the Delta Plan at least once every five years, and authorizes the Council, in its discretion, to revise the Delta Plan as it "deems appropriate." (§ 85300, subd. (c).)

In our view, the Delta Reform Act cannot properly be construed as requiring the Council to adopt performance measure targets as legally enforceable regulations. Nothing in the Act expressly imposes such an obligation. Rather, the Act authorizes the Council to adopt regulations "as needed" to carry out its powers and duties identified in the Act. The Legislature's stated purpose in requiring the Delta Plan to include performance measurements was to enable the Council to track progress in meeting the objectives of the Delta Plan. This purpose can be met without the adoption of performance measure targets as legally enforceable regulations. While we recognize that the Act requires the Council to adopt and implement a legally enforceable Delta Plan that includes performance measure targets associated with achieving the objectives of the Delta Plan, this does not compel the conclusion that the Council must adopt performance measure targets as legally enforceable regulations. The Delta Plan is not rendered unenforceable in the absence of such regulations.

This case involves a statutory scheme that identifies a complex problem (sustainable management of the Delta's resources), sets forth general goals and policy objectives, identifies certain requirements that must be included in a plan adopted by the Council to achieve the goals and objectives, and then broadly empowers the Council to

35

study the problem and to adopt appropriate regulations and guidelines as needed over time for state and local agencies that will achieve the goals and objectives. Given the language in the Act, it is clear to us that the Legislature chose to grant the Council broad authority to apply its expertise in determining how to accomplish the Legislature's goals and objectives, including whether to adopt performance measure targets as legally enforceable regulations. (See *ACIC*, *supra*, 2 Cal.5th at pp. 390-392 [Legislature confers broad authority when it authorizes an agency to adopt regulations " 'as are necessary' " or " 'as may be reasonably necessary' " to administer the statutory scheme]; *California Chamber of Commerce v. State Air Resources Bd.* (2017) 10 Cal.App.5th 604, 622-623 [Legislature delegated broad authority when it authorized state agency to design regulations, including distribution of emissions allowances *where appropriate*, to achieve statewide greenhouse gas emissions limit].) Accordingly, we conclude the Act permits, but does not require, the Council to adopt performance measure targets as legally enforceable regulations. Had the Legislature intended a contrary result, it could easily have said so in clear and certain terms. It did not. "When interpreting statutes, 'we follow the Legislature's intent, as exhibited by the plain meaning of the actual words of the law . . . . "This court has no power to rewrite the statute so as to make it conform to a presumed intention which is not expressed." ' " (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 59 (*Equilon*).)

### 2.2 *Mootness*

We agree with the Council that the remaining issues raised in its appeal are moot. It is well settled that appellate courts will decide only actual controversies. (*Cuenca v. Cohen* (2017) 8 Cal.App.5th 200, 216; *Finnie v. Town of Tiburon* (1988) 199 Cal.App.3d 1, 10.) " 'An appellate court will not review questions which are moot and which are only of academic importance.' [Citations.] A question becomes moot when, pending an appeal from a judgment of a trial court, events transpire that prevent the appellate court from granting any effectual relief." (*Gonzalez v. Munoz* (2007) 156 Cal.App.4th 413,

419.)  The legal test for effective relief is whether there is a "prospect of a remedy that can have a practical, tangible impact on the parties' conduct or legal status."  (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1490.)

In support of its mootness contention, the Council has asked us to take judicial notice of:  (1) the Delta Plan Amendments, which were adopted in 2018 while the appeals in this case were pending; and (2) court filings related to challenges to the Delta Plan Amendments and the PEIR for the Delta Plan Amendments.  We granted the Council's request.

Having reviewed the documents subject to judicial notice, we conclude that the remaining controversy over whether the Delta Plan violated the Delta Reform Act in the ways identified by the trial court has become moot.  The documents show that the Delta Plan Amendments specifically address the statutory violations found by the trial court.[20] The remaining issues raised in the Council's appeal ask us to evaluate the validity of the Council's actions with respect to the original 2013 Delta Plan.  However, the portions of the original Delta Plan that were invalidated by the trial court have been superseded by the adoption of the Delta Plan Amendments.  Thus, even if we were to consider the

_____

[20]  The petitioners in *Central Delta Water Agency, et al. v. Delta Stewardship Council* (San Francisco Super. Ct. case No. CPF-13-513048) and *California Water Impact Network, et al. v. Delta Stewardship Council* (San Francisco Super. Ct. case No. CPF-13-513047) have filed a motion to strike portions of:  (1) the Council's opening brief, (2) the Council's first request for judicial notice, and (3) the declaration filed in support of the request for judicial notice.  The petitioners ask us to strike the portions of these documents that contain substantive argument about the merits of the Delta Plan Amendments and/or seek to have this court adjudicate the merits of the Delta Plan Amendments in the first instance.  We deny the petitioners' motion to strike.  We are capable of simply ignoring any improper or irrelevant arguments.  It is a better use of judicial resources to focus on resolving the relevant issues raised by the Council rather than spend time determining whether any portion of the challenged documents should be stricken.  (See *Diaz-Barba v. Superior Court* (2015) 236 Cal.App.4th 1470, 1481-1482 [irrelevant matters in briefs have no persuasive weight in determining an appeal].)

merits of the outstanding issues and found in favor of the Council, we would be unable to grant any effectual relief. The invalidated portions of the original Delta Plan are no longer operative. Accordingly, the remaining controversy over whether the Delta Plan violated the Delta Reform Act in the ways identified by the trial court is moot. (See *East Sacramento Partnerships for a Livable City v. City of Sacramento* (2016) 5 Cal.App.5th 281, 305-306 [adoption of new general plan that eliminated a material condition mooted appellate claim regarding the old general plan that contained this condition]; *La Mirada Avenue Neighborhood Assn. of Hollywood v. City of Los Angeles* (2016) 2 Cal.App.5th 586, 588-590 (*La Mirada*) [adoption of an amended neighborhood plan rendered challenge to exceptions that were allowed only in the old plan moot].) The validity of the Delta Plan Amendments should be addressed by the trial court in the first instance.

We are not persuaded that an exception to the mootness doctrine applies. Various parties[21] contend that the remaining issues raised in the Council's appeal must be addressed because they present important questions of general public interest that are likely to recur yet evade review. (See *People v. Harrison* (2013) 57 Cal.4th 1211, 1218 [courts have inherent discretion to resolve a moot issue that is one of broad public interest that is likely to recur and may otherwise evade review].) We disagree. As noted above, the Delta Plan Amendments include amendments that specifically address the deficiencies in the original Delta Plan identified by the trial court, and the validity of those amendments are currently the subject of multiple new lawsuits. There has been no showing that the outstanding issues in the Council's appeal concerning the trial court's

---

[21] The parties include the petitioners in *North Coast Rivers Alliance, et al. v. Delta Stewardship Council* (Sacramento Super. Ct. case No. 34-2013-80001534), *California Water Impact Network, et al. v. Delta Stewardship Council* (San Francisco Super. Ct. case No. CPF-13-513047), *Central Delta Water Agency, et al. v. Delta Stewardship Council* (San Francisco Super. Ct. case No. CPF-13-513048), and *Save the California Delta Alliance v. Delta Stewardship Council* (San Francisco Super. Ct. case No. CPF-13-513049).

invalidation of the original Delta Plan remain relevant after the adoption of the Delta Plan Amendments. No party has demonstrated that these issues are likely to recur. Moreover, no party contends that the Council's actions in adopting the Delta Plan Amendments will evade judicial review. Under these circumstances, we find no basis to exercise our discretion to consider the moot issues. We reject the contention that the remaining issues raised in the Council's brief should be considered because there are "unresolved questions" regarding attorney fees.[22] (See *Paul v. Milk Depots, Inc.* (1964) 62 Cal.2d 129, 134 ["[i]t is settled that an appeal will not be retained solely to decide the question of liability for costs"] (*Paul*).)

Finally, we must determine the proper disposition of the moot issues. Ordinarily when a case becomes moot during the pendency of an appeal, the appellate court will not proceed to formal judgment, but will dismiss the appeal. (*Paul, supra,* 62 Cal.2d at p. 134.) In some instances, however, courts have concluded it is appropriate instead to reverse the judgment "solely for the purpose of restoring the matter to the jurisdiction of the superior court, with directions to the court to dismiss the proceeding." (*Ibid.*) In *Paul*, for example, the court adopted this approach to avoid implicitly affirming a ruling on the merits by dismissing the appeal as moot where a judgment ruling a state regulation unconstitutional was mooted by promulgation of a new regulation. (*Id.* at pp. 131-132, 134; see *La Mirada, supra*, 2 Cal.App.5th at pp. 590-591 [although a reviewing court ordinarily will dismiss the appeal if the case becomes moot, when the controversy is rendered moot through "subsequent legislative or administrative action" the court may adopt the alternative applied in *Paul*].) When the basis for the trial court's judgment

---

[22] The briefing in the consolidated fee case reveals that the resolution of that matter does not require us to determine the merits of the issues that have become moot in the merits case, that is, whether the Delta Plan violated the Delta Reform Act in the ways identified by the trial court.

becomes nonexistent due to postjudgment acts or events, an appellate court should
" 'dispose of the case, not merely of the appellate proceeding which brought it here.'
[Citation.]  That result can be achieved by reversing the judgment solely for the purpose
of restoring the matter to the jurisdiction of the superior court, with directions to the court
to dismiss the proceeding.  [Citations.]  Such a reversal, of course, does not imply
approval of a contrary judgment, but is merely a procedural step necessary to a proper
disposition of th[e] case." (*Paul*, at pp. 134-135.)

 As discussed above, the remaining issues raised in the Council's brief as to
whether the original Delta Plan violated the Delta Reform Act in the ways identified by
the trial court has been rendered moot as a result of the Council's adoption of the Delta
Plan Amendments, i.e., subsequent administrative action.  Because we have declined to
reach the merits of these issues, we will follow the procedure described in *Paul* and
reverse the judgments in the relevant underlying cases[23] for the limited purpose of
returning jurisdiction to the trial court so it can dismiss the moot portions of those cases.
" ' "Where an appeal is disposed of upon the ground of mootness and without reaching
the merits, in order to avoid ambiguity, the preferable procedure is to reverse the
judgment with directions to the trial court to dismiss the action for having become moot
prior to its final determination on appeal.  [Citations.]" [Citations.]' " (*Giles v. Horn*
(2002) 100 Cal.App.4th 206, 229 [reversal with directions to dismiss portion of judgment
that had become moot]; see *Coalition for a Sustainable Future in Yucaipa v. City of
Yucaipa* (2011) 198 Cal.App.4th 939, 941, 944-945 [following *Paul* where the basis for

---

[23]  The four cases are:  *North Coast Rivers Alliance, et al. v. Delta Stewardship Council*
(Sacramento Super. Ct. case No. 34-2013-80001534); *California Water Impact Network,
et al. v. Delta Stewardship Council* (San Francisco Super. Ct. case No. CPF-13-513047);
*Central Delta Water Agency, et al. v. Delta Stewardship Council* (San Francisco Super.
Ct. case No. CPF-13-513048); and *Save the California Delta Alliance v. Delta
Stewardship Council* (San Francisco Super. Ct. case No. CPF-13-513049)

the judgment had disappeared (the project) before the case could be fully litigated].) This reversal does not imply that the judgments were erroneous on the merits, but is solely for the purpose of returning jurisdiction to the trial court by vacating the otherwise final judgments solely on the ground of mootness. In following this procedure, we will appropriately avoid affirming the judgments by implication. (*Coalition for a Sustainable Future*, at pp. 944-945.)

**3.0     Federal and State Water Contractors**

The federal and state water contractors (hereafter Water Contractors) are local public agencies that hold water supply contracts under the CVP or SWP. Pursuant to these contracts, the Water Contractors divert water from the Delta and convey water previously stored in upstream reservoirs through the Delta, primarily for urban and agricultural uses in regions south of the Delta. Collectively, they deliver water to more than 25 million California residents and nearly three million acres of agricultural lands.[24] The Water Contractors filed separate opening briefs but have joined in each other's contentions on appeal and have filed joint respondents' briefs and reply briefs. Accordingly, we address their contentions together.

---

[24] The Water Contractors do not hold water rights. Rather, the U.S. Department of Reclamation holds all water rights to CVP water and the Department of Water Resources holds all water rights to SWP water. (*United States v. State Water Resources Control Bd.* (1986) 182 Cal.App.3d 82, 106; see *Westlands Water Dist. v. United States* (E.D. Cal. 2001) 153 F.Supp.2d 1133, 1149 ["The United States holds all water rights to CVP water"].) The Council has asked us to take judicial notice of the amicus curie brief filed by the Department of Water Resources in the trial court for the limited purpose of showing that, in the department's view, the Delta Plan complied with the Delta Reform Act and the petitions challenging the Delta Plan should be denied. That request is denied because the department's amicus curie brief is not relevant to the resolution of any issue before this court. (See *People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 422, fn. 2 (*Shamrock Foods*) ["any matter to be judicially noticed must be relevant to a material issue"].)

41

The Water Contractors contend that the trial court erred in failing to invalidate the Delta Plan's Water Resources Policy 1 (WR P1)—titled, "Reduce Reliance on the Delta Through Improved Regional Water Self-Reliance." According to the Water Contractors, WR P1 is unlawful because it: (1) exceeds the geographic scope of the Council's regulatory authority under the Delta Reform Act; (2) exceeds the Council's regulatory authority under the Act by regulating water rights; and (3) conflicts with the Act by frustrating rather than promoting the coequal goal of providing a more reliable water supply for the state. The Water Contractors additionally contend the trial court erred in determining that the Delta Plan's appeal process regarding covered actions is valid. Finally, the Water Contractors contend the trial court erred in concluding that the Council has the authority to adopt regulations to promote options for water conveyance in the Delta and storage systems. They maintain that the Legislature did not expressly or implicitly authorize or require the Council to adopt regulations in this regard. We find no merit in these contentions.

### 3.1 *Validity of WR P1*

Water Resources Policy 1, which is codified at section 5003 of title 23 of the California Code of Regulations, provides:

"(a) Water shall not be exported from, transferred through, or used in the Delta if all of the following apply:

"(1) One or more water suppliers that would receive water as a result of the export, transfer, or use have failed to adequately contribute to reduced reliance on the Delta and improved regional self-reliance consistent with all of the requirements listed in paragraph (1) of subsection (c);

"(2) That failure has significantly caused the need for the export, transfer, or use; and

42

"(3) The export, transfer, or use would have a significant adverse environmental impact in the Delta.

"(b) For purposes of Water Code section 85057.5 [subdivision] (a)(3) and section 5001 [subdivision] (j)(1)(E) of this Chapter, this policy covers a proposed action to export water from, transfer water through, or use water in the Delta, but does not cover any such action unless one or more water suppliers would receive water as a result of the proposed action.

"(c)(1) Water suppliers that have done all of the following are contributing to reduced reliance on the Delta and improved regional self-reliance and are therefore consistent with this policy:

"(A) Completed a current Urban or Agricultural Water Management Plan (Plan) which has been reviewed by the California Department of Water Resources for compliance with the applicable requirements of Water Code Division 6, Parts 2.55, 2.6, and 2.8;

"(B) Identified, evaluated, and commenced implementation, consistent with the implementation schedule set forth in the Plan, of all programs and projects included in the Plan that are locally cost effective and technically feasible which reduce reliance on the Delta; and

"(C) Included in the Plan, commencing in 2015, the expected outcome for measurable reduction in Delta reliance and improvement in regional self-reliance. The expected outcome for measurable reduction in Delta reliance and improvement in regional self-reliance shall be reported in the Plan as the reduction in the amount of water used, or in the percentage of water used, from the Delta watershed. For the purposes of reporting, water efficiency is considered a new source of water supply, consistent with Water Code section 1011(a).

"(2) Programs and projects that reduce reliance could include, but are not limited to, improvements in water use efficiency, water recycling, stormwater capture and use,

43

advanced water technologies, conjunctive use projects, local and regional water supply and storage projects, and improved regional coordination of local and regional water supply efforts." (Cal. Code Regs., tit. 23, § 5003.)

### 3.1.1 *Geographic Scope of the Council's Regulatory Authority*

We reject the Water Contractors' initial contention that WR P1 is unlawful because it exceeds the geographic scope of the Council's regulatory authority under the Delta Reform Act. This argument is predicated on the theory that requiring local water supply agencies—many of which are located hundreds of miles from the Delta—to undertake actions outside the Delta that adequately contribute to reduced reliance on the Delta and improved regional self-reliance for water supply constitutes unlawful regulatory action in excess of the Council's authority. According to the Water Contractors, WR P1 violates the Act because the Council's regulatory authority is limited to land use actions that occur within the boundaries of the Delta and Suisun Marsh. We disagree.

Under the Delta Reform Act, a state or local land use action that qualifies as a "covered action" must be consistent with the Act. (§ 85022, subd. (a).) To qualify as a "covered action" subject to the regulatory authority of the Council, a land use action must meet certain conditions, including "occur, in whole or in part, within the boundaries of the Delta or Suisun Marsh" (§ 85057.5, subd. (a)(1)), "be carried out, approved, or funded by the state or a local public agency" (§ 85057.5, subd. (a)(2)), be "covered by one or more provisions of the Delta Plan" (§ 85057.5, subd. (a)(3)), and "have a significant impact on achievement of one or both of the coequal goals" (§ 85057.5, subd. (a)(4)).

In enacting the Delta Reform Act, the Legislature expressly found that the coequal goal of "[p]roviding a more reliable water supply for the state involves implementation of water use efficiency and conservation projects, wastewater reclamation projects, desalination, and new and improved infrastructure, including water storage and Delta

44

conveyance facilities." (§ 85004, subd. (b).) The Act provides that it is the policy of California to establish a governance structure with the authority and responsibility to achieve various objectives, which the Legislature declared are "inherent in the coequal goals for management of the Delta." (§ 85020.) As particularly relevant here, these objectives include managing the Delta's water and environmental resources and the water resources of the state over the long term, promoting statewide water conservation, water use efficiency, and sustainable water use, and expanding statewide water storage. (§ 85020, subds. (a), (c), (d), (e), & (f).) The Act further provides that it is the policy of California "to reduce reliance on the Delta in meeting California's future water supply needs through a statewide strategy of investing in improved regional supplies, conservation, and water use efficiency." (§ 85021.) Toward this end, the Legislature mandated that "[e]ach region that depends on water from the Delta watershed shall improve its regional self-reliance for water through investment in water use efficiency, water recycling, advanced water technologies, local and regional water supply projects, and improved regional coordination of local and regional water supply efforts." (§ 85021.)

The Delta Reform Act mandates that the Delta Plan "promote statewide water conservation, water use efficiency, and sustainable use of water," (§ 85303) and include measures to promote a more reliable water supply that address all of the following: "(1) Meeting the needs for reasonable and beneficial uses of water"; "(2) Sustaining the economic vitality of the state"; and "(3) Improving water quality to protect human health and the environment." (§ 85302, subd. (d)(1)-(3).) As policy foundations, the Act states: "The longstanding constitutional principle of reasonable use and the public trust doctrine shall be the foundation of state water management policy and are particularly important and applicable to the Delta." (§ 85023.)

In our view, WR P1 clearly falls within the scope of the regulatory authority delegated to the Council under the Delta Reform Act. By its express terms, the policy

45

regulates land use actions that will occur within the boundaries of the Delta. It prohibits water from being exported from, transferred through, or used in the Delta if: (1) the water suppliers that would receive water as a result of these activities have failed to adequately contribute to the Act's stated policy of reducing reliance on the Delta through improved regional self-reliance for water supply; (2) that failure has significantly caused the need for the export, transfer, or use; and (3) the export, transfer, or use would have a significant adverse environmental impact in the Delta. (Cal. Code Regs., tit. 23, § 5003.) WR P1 is consistent with achieving the coequal goals of the Act, specific policy objectives articulated by the Legislature, including objectives declared to be inherent in the coequal goals, and the constitutional principle of reasonable use and the public trust doctrine. That WR P1 requires water suppliers to undertake certain actions outside the geographical boundaries of the Delta in order to receive water exported from, transferred through, or used in the Delta does not render the policy in excess of the Council's regulatory authority. Even if these actions are considered part of the regulated activity, the Act requires only that a covered action "occur, in whole or in part, within the boundaries of the Delta or Suisun Marsh." (§ 85057.5, subd. (a)(1).) Moreover, the Act specifically authorizes the Council to adopt and implement a legally enforceable Delta Plan that furthers the coequal goal of providing a more reliable water supply for California, which includes reduced reliance on the Delta in meeting California's future water supply needs through a statewide strategy of investing in improved regional supplies, conservation, and water use efficiency. To achieve the objective of reduced reliance, the Act mandates improved regional self-reliance from each region that depends on water from the Delta watershed, which includes regions outside the geographical boundaries of the Delta. The Water Contractors, for their part, have not pointed to any language in the Act convincing us that their statutory interpretation is correct. Had the Legislature intended the Water Contractors' more limited view of the Council's regulatory authority, it could have easily so stated.

46

We find no merit in the Water Contractors' suggestion that WR P1 is in excess of the Council's authority because it is "implausible" the Legislature "anoint[ed]" the Council as arbiter of local water supply management given "the robust legislation already in place" governing such management—Division 6 of the Water Code (§§ 10000-12999), titled, "Conservation, Development, and Utilization of State Water Resources." It is a settled principle of statutory construction that the Legislature " 'is deemed to be aware of statutes . . . already in existence, and to have enacted . . . a statute in light thereof. [Citation.]' " (*People v. Yartz* (2005) 37 Cal.4th 529, 538.) Even a cursory review of the statutory scheme and the record confirms that the Legislature was well aware of existing statutory law governing the management of water resources and enacted the Delta Reform Act in light thereof with the intent of granting the Council broad regulatory authority to achieve the coequal goals, (see, e.g., §§ 85001, subds. (a), (c), 85020, 85031, 85032, 85210, subd. (i), 85300), which includes the authority to adopt WR P1. Indeed, at the outset of the Act, the Legislature expressly found and declared that the "Delta watershed and California's water infrastructure are in crisis and *existing Delta policies are not sustainable.* Resolving the crisis requires fundamental reorganization of the state's management of Delta watershed resources." (§ 85001, subd. (a), italics added.) The Legislature acknowledged that the Act was enacted in response to the Strategic Plan developed by the Task Force (§ 85001, subd. (b)), which found that the Delta is in crisis and specifically concluded: "Compounding the crisis is that the current governance structure for water and the Delta has failed. More than 200 federal, state, and local government agencies have some jurisdiction in the Delta. Everyone is involved but no one is [in] charge. Moreover, existing fragmentation of policies and projects guarantees continued failure in restoring the Delta ecosystem and in ensuring reliable water supplies for California." The Strategic Plan therefore recommended that the Legislature create a new governance structure with needed legal authority and competencies to achieve the coequal goals of restoring the Delta's ecosystem and creating a more reliable water

47

supply for California.  The Legislature followed this recommendation.  (See, e.g., §§ 85001, subd. (c), 85020, subds. (a)-(h), 85210, subd. (i).)

### 3.1.2  *The Council's Regulatory Authority Over Water Rights*

We also reject the Water Contractors' contention that WR P1 is unlawful because the Council has no regulatory authority over water rights under the Delta Reform Act. According to the Water Contractors, the Water Board is the only administrative agency authorized to regulate water rights.  We disagree.

Resolution of the statutory question before us does not require an extended discussion of California water law principles.  It suffices to say that water use by those holding water rights in California " 'is limited by the "reasonable use" doctrine, which forbids the waste of water or its unreasonable use.' " (*Siskiyou County Farm Bureau v. Department of Fish & Wildlife* (2015) 237 Cal.App.4th 411, 423.)  In addition, the public trust doctrine vests the state with authority to act as trustee of all waters of the state for the benefit of the people to ensure that water resources are put to beneficial use to the fullest extent of which they are capable, and to prevent waste or unreasonable use of water.  (*Id*. at pp. 423-424.)

The Legislature has granted the Water Board " 'broad authority to control and condition water use, insuring utilization consistent with public interest.'  [Citation.]  Its enabling statute [(section 174)] describes the Board's function as 'to provide for the orderly and efficient administration of the water resources of the state' and grants it the power to 'exercise the adjudicatory and regulatory functions of the state in the field of water resources.'  [Citation.]  In that role, the Board is granted 'any powers . . . that may be necessary or convenient for the exercise of its duties authorized by law' [citation], including the power to 'make such reasonable rules and regulations as it may from time to time deem advisable . . . .'  [Citation.]  Among its other functions, 'the . . . board shall take all appropriate proceedings or actions before executive, legislative, or judicial agencies to prevent waste, unreasonable use, unreasonable method of use, or

unreasonable method of diversion of water in this state.' [Citation.] The Board's authority to prevent unreasonable or wasteful use of water extends to all users, regardless of the basis under which the users' water rights are held." (*Light v. State Water Resources Control Bd.* (2014) 226 Cal.App.4th 1463, 1481-1482.)

In support of their contention that the Council has no regulatory authority over water rights, the Water Contractors rely on several "savings" clauses set forth in sections 85031 and 85032. As relevant here, section 85031, subdivision (a) provides: "This division [(i.e., the Delta Reform Act)] does not diminish, impair, or otherwise affect in any manner whatsoever any . . . water rights protections . . . provided under the law." (§ 85031, subd. (a).) Subsection (d) of the same section provides: "Unless otherwise expressly provided, nothing in [the Act] supersedes, reduces, or otherwise affects existing legal protections, both procedural and substantive, relating to the state board's regulation of diversion and use of water . . . . Nothing in [the Act] expands or otherwise alters the board's existing authority to regulate the diversion and use of water or the courts' existing concurrent jurisdiction over California water rights." (§ 85031, subd. (d).) Section 85032, subdivision (i) provides that the Act does not affect "[a]ny water right." (§ 85032, subd. (i).)

Contrary to the Water Contractors' contention, nothing in the statutory provisions on which they rely establishes that the Council lacks regulatory authority over water rights under the Delta Reform Act. When considered in its entirety, the statutory scheme makes clear that the Council has such authority. The Legislature's stated intent in enacting the Act was to "provide for the sustainable management of the . . . Delta ecosystem, to provide for a more reliable water supply for the state, to protect and enhance the quality of water supply from the Delta, and to *establish a governance structure that will direct efforts across state agencies* to develop a legally enforceable Delta Plan," (§ 85001, italics added) which is defined as a comprehensive, long-term management plan for the Delta as adopted by the Council (§ 85059) that furthers the

49

coequal goals (§§ 85054, 85300, subd. (a)). The Legislature expressly declared that it is the policy of California to "[e]*stablish a new governance structure with the authority, responsibility, and accountability*" to achieve the following objectives, which are inherent in the coequal goals for management of the Delta: "(a) Manage the Delta's water and environmental resources and the water resources of the state over the long term. [¶] (b) Protect and enhance the unique cultural, recreational, and agricultural values of the California Delta as an evolving place. [¶] (c) Restore the Delta ecosystem, including its fisheries and wildlife, as the heart of a healthy estuary and wetland ecosystem. [¶] (d) Promote statewide water conservation, water use efficiency, and sustainable water use. [¶] (e) Improve water quality to protect human health and the environment consistent with achieving water quality objectives in the Delta. [¶] (f) Improve the water conveyance system and expand statewide water storage. (§ 85020.) As policy foundations, the Delta Reform Act provides: "The longstanding constitutional principle of reasonable use and the public trust doctrine shall be the foundation of state water management policy and are particularly important and applicable to the Delta." (§ 85023.)

The Legislature directed the Council to "establish and oversee a committee of agencies responsible for implementing the Delta Plan," and mandated that "[e]ach agency shall coordinate its actions pursuant to the Delta Plan with the council and the other relevant agencies." (§ 85204.) The Legislature further mandated that the Council consult with state agencies with responsibilities in the Delta in developing the Delta Plan (e.g., Water Board), and that, upon the request of the Council, such state agencies must cooperate with the Council in developing the Delta Plan. (§ 85300, subd. (b).) The Legislature authorized the Council to adopt regulations as needed to carry out its powers and duties identified in the Act. (§ 85210, subd. (i).)

We conclude that the Legislature's delegation of authority to the Council under the Delta Reform Act includes the authority to regulate water use by those holding water

50

rights in furtherance of the Council's duty to adopt and implement a legally enforceable Delta Plan that furthers the coequal goals in a manner consistent with the reasonable use and public trust doctrines. The scope of this regulatory authority is limited under the Act to state and local land use actions that qualify as covered actions. (§ 85022, subd. (a); see § 85057.5, subd. (a) [defining covered actions, which are geographically limited to plans, programs, or projects that will occur, in whole or part, within the boundaries of the Delta or Suisun Marsh].) That the Council's authority to regulate water use under the Act overlaps with the Water Board's regulatory jurisdiction is not a basis to invalidate WR P1. (See *Pacific Lumber Co. v. State Water Resources Control Bd.* (2006) 37 Cal.4th 921, 932-936 [concluding that both the Water Board and the Department of Forestry could regulate water quality impacts of proposed timber harvest, noting that "overlapping jurisdiction" is "an uncontroversial concept under our law even absent a savings clause"].) Indeed, the statutory scheme reflects that the Legislature intended an overlap in regulatory authority and for the Council to work and coordinate its actions with all agencies having responsibilities in the Delta, including the Water Board.

Because the relevant statutory language is clear and unambiguous, we need not consider the legislative history cited by the Water Contractors in resolving this claim. (*People v. Valencia* (2017) 3 Cal.5th 347, 357.) But even if we were to consider the legislative history, we find it does not support the conclusion that the Council has no regulatory authority over water rights under the Delta Reform Act.

### 3.1.3  *Whether WR P1 Conflicts with the Delta Reform Act*

Finally, we reject the Water Contractors' contention that WR P1 is unlawful because it conflicts with the Delta Reform Act by frustrating rather than promoting the coequal goal of providing a more reliable water supply for California. According to the Water Contractors, prohibiting water supply covered actions and water transfers through the Delta diminishes water supply reliability by denying access to otherwise available Delta water supplies. We find no merit in this contention.

As we concluded above, WR P1 is consistent with the Delta Reform Act and furthers the coequal goal of providing a more reliable water supply for California. This conclusion is supported by evidence in the record. Prior to the Legislature's enactment of the Act, the Strategic Plan determined that creating a more reliable water supply for California would require, among other things, increased storage, Californians to become less dependent on water supply from the Delta, statewide efforts to conserve water, and more responsible use of existing supplies. The Strategic Plan concluded that conservation, water system efficiency, and promoting regional self-sufficiency are among the actions that are most likely to improve California's water future in the near term. The Water Contractors have failed to provide legal analysis demonstrating that WR P1 conflicts with any provision of the Act.[25] Moreover, as in the trial court, they have failed to identify evidence in the record showing that WR P1 will not further a more reliable water supply for California.

### 3.2    *The Delta Plan's Appeal Process*

The Water Contractors contend that the Delta Plan's procedures governing appeals of covered actions, which allow for multiple appeals and remands of an agency's certification of consistency with the Delta Plan, is in excess of the regulatory authority

---

[25] We reject the Water Contractors' contention that the reduced reliance policy set forth in section 85021 does not support WR P1. WR P1 is consistent with the policy objective and the means by which to achieve that objective articulated by the Legislature in section 85021. Because we find the language of this statutory provision to be clear and unambiguous, including the term "future" in the context of reducing "reliance on the Delta in meeting California's future water supply needs," we need not consider the legislative history cited by the Water Contractors in support of their position. (*Nolan v. City of Anaheim* (2004) 33 Cal.4th 335, 340.) We note the Council has asked us to take judicial notice of legislative history related to this issue and the definition of "future." That request is denied; the legislative history of section 85021 and the definition of "future" as used in that provision are not relevant to the resolution of any issue before the court. (*Shamrock Foods, supra*, 24 Cal.4th at p. 422, fn. 2 ["any matter to be judicially noticed must be relevant to a material issue"].)

52

delegated to the Council under the Delta Reform Act. According to the Water Contractors, the plain language of section 85225.25 limits the Council's appellate review of a covered action to a single appeal of a certification of consistency and vests the certifying agency with the discretion to proceed with a covered action, even if the Council has found insufficient evidence for the initial certification, so long as the agency files a revised certification addressing the Council's findings. The Water Contractors maintain that section 85225.25 "expressly leaves the ultimate decision on how and whether to implement the covered action with the certifying agency." We disagree.

" ' "A fundamental rule of statutory construction is that a court should ascertain the intent of the Legislature so as to effectuate the purpose of the law. [Citations.] In construing a statute, our first task is to look to the language of the statute itself. [Citation.] When the language is clear and there is no uncertainty as to the legislative intent, we look no further and simply enforce the statute according to its terms. [Citations.] [¶] Additionally, however, we must consider the [statutory language] in the context of the entire statute [citation] and the statutory scheme of which it is a part. 'We are required to give effect to statutes "according to the usual, ordinary import of the language employed in framing them." [Citations.]' [Citations.] ' "If possible, significance should be given to every word, phrase, sentence and part of an act in pursuance of the legislative purpose." [Citation.] . . . "When used in a statute [words] must be construed in context, keeping in mind the nature and obvious purpose of the statute where they appear." [Citations.] Moreover, the various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole. [Citations.]' " ' " (*Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 743.) "Ultimately we choose the construction that comports most closely with the apparent intent of the lawmakers, with a view to promoting rather than defeating the general purpose of the statute. [Citations.] Any

interpretation that would lead to absurd consequences is to be avoided." (*Allen v. Sully-Miller Contracting Co*. (2002) 28 Cal.4th 222, 227.)

Under the Delta Reform Act, state and local land use actions that qualify as " 'covered actions' " under section 85057.5 must be consistent with the Delta Plan. (§ 85022, subd. (a).) The Act requires any state or local public agency that proposes to undertake a covered action to prepare a written certification of consistency prior to initiating the implementation of that covered action, with detailed findings as to whether the covered action is consistent with the Delta Plan, and then to submit that certification to the Council. (§ 85225.) Any person may challenge a proposed covered action as inconsistent with the Delta Plan, in that it will have a significant adverse impact on achievement of one or both of the coequal goals, by filing an appeal with regard to a certification of consistency submitted to the Council. (§ 85225.10, subd. (a).) If no appeal is filed, the state or local public agency may proceed to implement the covered action. (§ 85225.15.) If an appeal is filed, the Council must hold a hearing, unless it is determined that the issue raised on appeal is not within the Council's jurisdiction or does not raise an appealable issue. (§ 85225.20.)

After a hearing on an appealed action, the Council is required to make "specific written findings either denying the appeal or remanding the matter to the state or local public agency for reconsideration of the covered action based on the finding that the certification of consistency is not supported by substantial evidence in the record before the state or local public agency that filed the certification. Upon remand, the state or local agency may determine whether to proceed with the covered action. If the agency decides to proceed with the action or with the action as modified to respond to the findings of the council, the agency shall, prior to proceeding with the action, file a revised certification of consistency that addresses each of the findings made by the council and file that revised certification with the council." (§ 85225.25.) The Legislature mandated that the Council adopt administrative procedures governing appeals. (§ 85225.30.)

54

In Appendix D—titled, "Administrative Procedures Governing Appeals, Statutory Provisions Requiring Other Consistency Reviews, and Other Forms of Review or Evaluation by the Council"—the Delta Plan sets forth a detailed description of the administrative procedures governing appeals of certifications of consistency submitted to the Council by a state or local public agency. As relevant here, the Delta Plan provides that any person, including any member of the Council or its executive officer, may file an appeal with regard to a certification of consistency submitted to the Council, claiming that a proposed covered action is inconsistent with the Delta Plan and, as a result of that inconsistency, that action will have a significant adverse impact on the achievement of one or both of the goals of the Act. The Delta Plan further provides that the Council must "make its decision on the appeal within 60 days of hearing the appeal, and [must] make specific written findings defining the covered action under review and either denying the appeal or remanding the matter to the state or local public agency for reconsideration of the covered action based on the finding that the certification of consistency is not supported by substantial evidence in the record before the state or local public agency that filed the certification." Finally, the Delta Plan provides that, "No covered action which is the subject of an appeal shall be implemented unless one of the following conditions has been met: [¶] a) The council has denied the appeal; [¶] b) The public agency has pursuant to Water Code section 85225.[2]5 decided to proceed with the action as proposed or modified and has filed with the council a revised certification of consistency addressing each of the findings made by the council, 30 days has elapsed and no person has appealed the revised certification; or [¶] c) The council or its executive officer has dismissed the appeal for one or both of the following reasons: [¶] 1. The appellant has failed to provide information in her possession or under her control within the time requested or [¶] 2. The issue raised is not within the council's jurisdiction or fails to raise an appealable issue." The Delta Plan explains, "If the covered action is

55

found to be inconsistent, the project may not proceed until it is revised so that it is consistent with the Delta Plan."

We find no merit in the Water Contractors' contention that the Delta Plan's appeal process violates the Delta Reform Act by permitting an appeal to be taken from a revised certification of consistency submitted to the Council. The Water Contractors' interpretation of section 85225.25 is not supported by the plain language of the statute, which provides that, when an appealed action is remanded to the state or local agency for reconsideration of the covered action based on the Council's determination that the certification of consistency is not supported by substantial evidence, "the state or local agency may determine whether to proceed with the covered action. If the agency decides to proceed with the action or with the action as modified to respond to the findings of the council, the agency shall, prior to proceeding with the action, file a revised certification of consistency that addresses each of the findings made by the council and file that revised certification with the council." (§ 85225.25.) The Water Contractors construe this language as prohibiting any appeal challenging a revised certification of consistency submitted to the Council. In doing so, they violate the "cardinal rule" of statutory construction that courts must not add statutory language not included therein. (*Security Pacific National Bank v. Wozab* (1990) 51 Cal.3d 991, 998; see Code Civ. Proc, § 1858 ["In the construction of a statute or instrument, the office of the Judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted."].) By its express terms, the Act permits any person who claims that a proposed covered action is inconsistent with the Delta Plan to file an appeal challenging a certification of consistency submitted to the Council. (§ 85225.10, subd. (a).) The Act makes no exception when a *revised* certification of consistency is submitted to the Council. Surely, if the Legislature had intended to prohibit an appeal under such circumstances, it would have simply said so. It did not. The Water Contractors' reliance on legislative history to support their

56

interpretation is misplaced. Where, as here, " 'there is no ambiguity or uncertainty in the language, the Legislature is presumed to have meant what it said, and we need not resort to legislative history to determine the statute's true meaning.' " (*People v. Skiles* (2011) 51 Cal.4th 1178, 1185; *Equilon, supra*, 29 Cal.4th at p. 61 ["Where . . . legislative intent is expressed in unambiguous terms, we must treat the statutory language as conclusive; 'no resort to extrinsic aids is necessary or proper.' "].)

We note that the Water Contractors' interpretation of the Delta Reform Act must also be rejected because construing the statute in the manner they urge would defeat the Legislature's stated intent that state and local land use actions that qualify as covered actions must be consistent with the Delta Plan, (§ 85022, subd. (a)) and that the Delta Plan be legally enforceable (§ 85001, subd. (c)). The Legislature established a specific process by which the Council ensures that proposed covered actions are consistent (i.e., comply) with the Delta Plan. (§§ 85225-85225.25.) If we were to adopt the Water Contractors' construction of the Act, the Council would lack the authority to enforce compliance with the Act under certain circumstances. Such a construction does not comport with the Legislature's stated intent. Therefore, we cannot conclude that the Legislature intended to prohibit the filing of an appeal challenging a state or local agency's submission of a revised certification of consistency.

Finally, we reject the Water Contractors' assertion that their interpretation of the Act "does not mean the consistency requirement is unenforceable" because "[a] party opposed to a covered action may still challenge a revised consistency determination in the courts." The Water Contractors cite no statutory text or otherwise provide any meaningful legal analysis or authority supporting their assertion. We therefore deem this point to be without foundation, requiring no further discussion. (*Central Valley Gas Storage, LLC v. Southam* (2017) 11 Cal.App.5th 686, 694-695.)

### 3.3 *The Council's Regulatory Authority Regarding Water Conveyance in the Delta and Storage Systems*

Section 85304 provides: "The Delta Plan shall promote options for new and improved infrastructure relating to the water conveyance in the Delta, storage systems, and for the operation of both to achieve the coequal goals." The Delta Plan explained that the Council did not adopt any recommendations or policies related to these requirements due to the ongoing development of the Bay Delta Conservation Plan (BDCP), a major project considering large-scale improvements in water conveyance and large-scale ecosystem restoration in the Delta, which must be incorporated into the Delta Plan if it meets certain statutory requirements set forth in section 85320. The Delta Plan stated that "[t]he BDCP process is considering a range of options for conveying water through or around the Delta," and that the BDCP "is being developed to contribute to improving water supply reliability by modifying Delta conveyance facilities to create a more natural flow pattern in the Delta and allow for water exports when hydrologic conditions result in the availability of sufficient water, consistent with the requirements of State and federal law and the terms and conditions of SWP and CVP water delivery contracts, and other existing applicable agreements." The Delta Plan noted that the BDCP process was not complete at the time it was published, and concluded that the agencies pursuing the BDCP were in the best position to develop possible conveyance options, evaluate the options, and decide on the best one. The Delta Plan, however, noted that the Council intended to revisit the issue of conveyance to determine how to facilitate improved conveyance facilities if the BDCP process was not completed by January 1, 2016.

The trial court found that the Delta Plan violated the Delta Reform Act because it did not include any regulatory policies or recommendations regarding conveyance options or storage systems in violation of section 85304. The court acknowledged that the BDCP, if finalized, would likely contain a conveyance choice but reasoned that any

58

future modifications to the Delta Plan are not relevant to whether the plan currently complies with the Act. In response to the Council's motion for clarification, the trial court determined that the Council had the discretion to satisfy the statutory requirements set forth in section 85304 by adopting legally enforceable regulations or nonbinding recommendations.

On appeal, the Water Contractors contend that the trial court erred because the Delta Reform Act does not authorize the Council to adopt legally enforceable regulations to satisfy the requirements set forth in section 85304. We disagree.

As an initial matter, we note that the documents subject to judicial notice demonstrate that the Delta Plan Amendments do not include any regulatory policy intended to be a legally enforceable regulation that satisfies the requirements set forth in section 85304. Rather, the Council adopted a set of recommendations in this regard. Under these circumstances, we would ordinarily decline to consider the issue raised by the Water Contractors on the ground that it fails to present a justiciable controversy. (*Association of Irritated Residents v. Department of Conservation* (2017) 11 Cal.App.5th 1202, 1223 [under the justiciability doctrine, the duty of every court is to decide actual controversies by a judgment which can be carried into effect, and not to declare principles or rules of law which cannot affect the matter in issue in the case before it].) However, this issue is ripe for review, and we will address it here, because various parties[26] contend that the trial court erred by failing to conclude that the Delta Reform Act requires, rather than permits, the Council to adopt legally enforceable regulations to satisfy the requirements of section 85304.

---

[26] The parties include the petitioners in *California Water Impact Network, et al. v. Delta Stewardship Council* (San Francisco Super. Ct. case No. CPF-13-513047), *Central Delta Water Agency, et al. v. Delta Stewardship Council* (San Francisco Super. Ct. case No. CPF-13-513048), and *Save the California Delta Alliance v. Delta Stewardship Council* (San Francisco Super. Ct. case No. CPF-13-513049).

We find no error. As we have explained, the Legislature delegated broad authority to the Council to "adopt regulations or guidelines as needed to carry out the powers and duties identified in this [Act]." (§ 85210, subd. (i).) Under section 85304, the Legislature mandated that the Delta Plan "promote options for new and improved infrastructure relating to the water conveyance in the Delta, storage systems, and for the operation of both to achieve the coequal goals." However, nothing in this provision or any other provision in the Act can be construed as requiring the Council to adopt regulations to satisfy the requirements in section 85304. Under the Act, the Council has the discretion to adopt recommendations or regulations to satisfy these requirements.[27] Had the Legislature intended to limit the Council's discretion in how to satisfy the requirements of section 85304, it would have included express statutory language doing so. It did not. As we concluded above, that the Act requires the Council to adopt and implement a legally enforceable Delta Plan, does not compel the conclusion that the Council was required to adopt legally enforceable regulations to satisfy the requirements in section 85304. The Delta Plan is not rendered unenforceable by the absence of regulations in this regard. Moreover, the language of the Act makes clear that the

[27] The Council has asked us to take judicial notice of the definition of "promote" in the Oxford Dictionary. The Council's request does not include the definition but rather a link to the "UK English" dictionary from the Oxford University Press (https://www.lexico.com/definition/future). We note the "US English" dictionary definition of "promote" varies only slightly from the definition the Council offers (https://www.lexico.com/en/definition/future). We grant the Council's request. (Evid. Code, § 451, subd. (e) [judicial notice shall be taken of "[t]he true signification of all English words and phrases and of all legal expressions"].) The Oxford Dictionary (UK version) defines "promote" to mean "[s]upport or actively encourage (a cause, venture, etc.); further the progress of." (Oxford University Press (Online ed. 2019) <https://www.lexico.com/definition/future> [as of Apr. 7, 2020], archived at: <https://perma.cc/8KE6-7RRV>.) The dictionary gives the following example sentence: " '*some regulation is still required to promote competition.*' " (*Ibid.*) The adoption of recommendations or regulations to satisfy the requirements in section 85304 fall within the definition of "promote."

Legislature chose to grant the Council broad authority to apply its expertise in determining how to fulfill its obligations under the Act to achieve the coequal goals, including whether to adopt regulations or recommendations to satisfy the requirements in section 85304.

## 4.0    CDWA and C-WIN[28]

CDWA and C-WIN are comprised of:  (1) Delta-based local governmental entities, including water agencies and reclamation districts; (2) California nonprofit public interest organizations and nonprofit public benefit organizations; and (3) landowners in the Delta.  CDWA and C-WIN filed a joint respondent's brief on appeal. That brief also includes the opening brief for CDWA's cross-appeal.  C-WIN did not file an appeal or cross-appeal.

In its cross-appeal, CDWA contends the trial court erred in failing to invalidate certain portions of the Delta Plan (e.g., WR P1) on the ground that they are not based on best available science and the advice provided by the Delta Independent Science Board (hereafter DISB).  According to CDWA the Council treated the mandatory language of section 85308 as "mere suggestion, blatantly disregarding DISB comments while drafting the Delta Plan," including, among other things, disregarding DISB's recommendation to provide clear performance measures and triggers, conceptual modeling, or references to conceptual models guiding development of the Delta Plan.  In support of its  claim, CDWA states, "Petitioners do not allege that the Delta Plan's underlying science was improper, but rather that portions of the Delta Plan are not supported by any science. Wholly failing to provide scientific support for the Delta Plan, and not following DISB

---

[28]  The petitioners in *Central Delta Water Agency, et al. v. Delta Stewardship Council* (San Francisco Super. Ct. case No. CPF-13-513048) and *California Water Impact Network, et al. v. Delta Stewardship Council* (San Francisco Super. Ct. case No. CPF-13-513047) have filed a joint brief.  We refer to these petitioners collectively as CDWA and C-WIN.

direction on such issues, violated section 85308, subdivision (a)." We conclude that CDWA has failed to demonstrate error.

As part of the Delta Reform Act, the Legislature established the DISB (§ 85280, subd. (a)) and mandated that the Delta Plan "[b]e based on the best available scientific information and the independent science advice provided by the . . . [DISB]" (§ 85308, subd. (a); see § 85302, subds. (a), (g) ["the council shall make use of the best available science" in implementing the Delta Plan to "further the restoration of the Delta ecosystem and a reliable water supply"]). The Act requires the DISB to "provide oversight of the scientific research, monitoring, and assessment programs that support adaptive management of the Delta through periodic reviews of each of those programs that shall be scheduled to ensure that all Delta scientific research, monitoring, and assessment programs are reviewed at least once every four years," (§ 85280, subd. (a)(3)) and to "submit to the council a report on the results of each review, including recommendations for any changes in the programs reviewed by the board" (§ 85280, subd. (a)(4)).

The trial court rejected CDWA's contention that the Council had failed to use best available science with respect to various portions of the Delta Plan, including the adoption of WR P1 and several other regulatory policies. The court found that the Council had either used best available science or that CDWA had failed to establish that the Council had not used best available science. On appeal, CDWA has framed its argument as a legal question as to whether the Delta Plan was required to be based on best available science and the advice of the DISB.[29] However, the question for us is whether there is no substantial evidence supporting a finding that the allegedly defective

---

[29] The Council does not dispute this point. Indeed, the Delta Plan specifically acknowledges that the Act requires the plan to be based on the best available scientific information and the independent science advice provided by the DISB. (§ 85308, subds. (a) & (f).) The issue is not whether this is a mandatory statutory requirement but rather whether the Delta Plan violated this requirement in the ways identified by CDWA.

portions of the Delta Plan were based on best available science and the advice of the DISB. This is because the nature of the alleged defects in the Delta Plan are predominantly factual. (See *Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 426-427, 435.) In applying the substantial evidence standard, the appellant bears the burden of proving there was no substantial evidence in the record to support the agency's decision. (*California Native Plant Society v. City of Rancho Cordova* (2009) 172 Cal.App.4th 603, 626.) To do so, appellant must set forth in its brief all the material evidence, not merely evidence supporting its position. (*Ibid*.) The reason for this is that "if the appellants fail to present us with all the relevant evidence, then the appellants *cannot* carry their burden of showing the evidence was insufficient to support the agency's decision because support for that decision may lie in the evidence the appellants ignore." (*State Water Resources Control Bd. Cases, supra*, 136 Cal.App.4th at pp. 749-750.)

The Council contends that CDWA has forfeited its claim of error by offering a one-sided recitation of the evidence. We agree. Where, as here, an opening brief fails to recite and discuss the record that supports the challenged agency decision, the appellant is deemed to have forfeited the substantial evidence argument. (*State Water Resources Control Bd. Cases, supra*, 136 Cal.App.4th at p. 749.) "A reviewing court will not independently review the record to make up for appellant's failure to carry his burden." (*Defend the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1266.)

We are unpersuaded by CDWA's contention that the Act required the Council, as a matter of law, to include all of the recommendations and advice provided by the DISB in the original Delta Plan. The text of the statute does not impose such a requirement. The statute mandates that the Delta Plan be built upon principles of adaptive management (§ 85052) and be *based* on the best available scientific information and advice provided by the DISB (§ 85308, subds. (a), (f)). CDWA has not provided authority and legal analysis convincing us that their interpretation is correct.

63

**5.0     Delta Alliance**

Delta Alliance is an unincorporated association.  Its organizational purpose is to work with local, state, and federal government agencies to create a balanced state water plan that keeps the Delta a safe and healthy environment while providing reasonable water exports for other parts of the state.  Its members include people who own homes in the Delta, recreate in the Delta, and earn their living working for Delta-related businesses.

Delta Alliance contends that the 73 recommendations set forth in the Delta Plan are invalid because they constitute regulations within the meaning of the APA and were not adopted in compliance with the rulemaking procedures of the APA.  Delta Alliance further contends that Appendix A to the Delta Plan is invalid because it constitutes an interpretative regulation within the meaning of the APA that was not adopted in compliance with the rulemaking procedures of the APA.  From this premise, Delta Alliance argues that the Council's decision not to adopt water conveyance regulations or recommendations based on Appendix A is void and should be "set aside."  Finally, Delta Alliance contends that the trial court erred in failing to invalidate the Delta Plan's flow policy, i.e., Ecosystem Restoration Policy 1 (ER P1)—titled, "Delta Flow Objectives." According to Delta Alliance, the trial court should have invalidated ER P1 on the ground that it is arbitrary and capricious because it fails to advance the goal of restoring Delta flows in violation of sections 85302, subdivision (e)(4) and 85020, subdivision (c).  We reject these contentions.

  5.1     *APA*

    5.1.1  *Applicable Legal Principles*

"The APA subjects proposed agency regulations to certain procedural requirements as a condition to their becoming effective."  (*Morning Star Co. v. State Bd. of Equalization* (2006) 38 Cal.4th 324, 332 (*Morning Star*).)  " 'If a policy or procedure falls within the definition of a "regulation" within the meaning of the APA, the promulgating agency must comply with the procedures for formalizing such regulation,

64

which include public notice and approval by the Office of Administrative Law (OAL).' " (*Capen v. Shewry* (2007) 155 Cal.App.4th 378, 386.)

The APA defines " '[r]egulation' " to mean "every rule, regulation, order, or standard of general application or the amendment, supplement, or revision of any rule, regulation, order, or standard adopted by any state agency to implement, interpret, or make specific the law enforced or administered by it, or to govern its procedure." (Gov. Code, § 11342.600.) "A regulation subject to the APA thus has two principal identifying characteristics. [Citation.] First, the agency must intend its rule to apply generally, rather than in a specific case. The rule need not, however, apply universally; a rule applies generally so long as it declares how a certain class of cases will be decided. [Citation.] Second, the rule must 'implement, interpret, or make specific the law enforced or administered by [the agency], or . . . govern [the agency's] procedure.' " (*Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 571; see *Morning Star, supra*, 38 Cal.4th at pp. 333-334 [same].)

A rule that constitutes a regulation within the meaning of the APA is invalid if it was not adopted in conformity with the procedural requirements of the APA. (*Morning Star, supra*, 38 Cal.4th at p. 333; see *Naturist Action Com. v. Department of Parks & Recreation* (2009) 175 Cal.App.4th 1244, 1250 [If an agency adopts a regulation without complying with the APA requirements it is deemed an " 'underground regulation' " and is invalid].) "Whether an agency action constitutes a regulation is a question of law that we review de novo." (*County of San Diego v. Bowen* (2008) 166 Cal.App.4th 501, 517.)

### 5.1.2 *Delta Plan Recommendations*

Although not entirely clear, we construe Delta Alliance's brief as asserting that all 73 recommendations in the Delta Plan constitute unlawful regulations under the APA. Basic rules of appellate procedure prevent us from addressing this claim on the merits. The record reflects that this issue was not raised in the briefing filed by Delta Alliance in the trial court. The trial court's order makes no mention of this issue. "It is axiomatic

that arguments not raised in the trial court are forfeited on appeal." (*Kern County Dept. of Child Support Services v. Camacho* (2012) 209 Cal.App.4th 1028, 1038 (*Kern County*).)

But even if this issue was not forfeited, Delta Alliance has failed to demonstrate that any of the recommendations in the Delta Plan amount to an unlawful regulation under the APA. Delta Alliance argues the 73 recommendations in the Delta Plan were required to be adopted as regulations in compliance with the APA because they constitute "guidelines" within the meaning of the APA as they interpret, implement, and make specific the law administered by the Council—the Delta Reform Act. According to Delta Alliance, the Delta Plan's recommendations "apply generally to all future actions affecting the Delta or implicating the [c]oequal [g]oals," and they "seek to get other agencies to take specific actions that will impact the Delta, California's water system, and the public." Delta Alliance, however, failed to recite the text of any recommendation and provide legal analysis explaining how it constitutes an unlawful regulation under the APA. Instead, Delta Alliance points to language in the Delta Plan, which states that the "working parts" of the Delta Plan include the 73 recommendations and 14 policies, and that the recommendations are nonregulatory but call out actions essential to achieving the coequal goals. Delta Alliance then references the Delta Plan's Ecosystem Restoration Recommendation 6 by noting that the Delta Plan " 'asks the Department of Fish and Wildlife to change angling rules to permit heavier fishing and somewhat suppress the bass population,' " which are nonnative "voracious predators" that are helping to deplete native salmon and smelt. Delta Alliance concludes its argument by stating, "None of the Delta Plan Recommendations were submitted to OAL or published in the California Code of Regulations. This Court should hold that all of the required components of the Delta Plan must be adopted as legally binding regulations. To the extent any provisions are left, Delta Alliance respectfully urges the Court to hold that the Delta Plan

Recommendations must be adopted as guidelines pursuant to Government Code section 11340.5, subd. (a)."

Delta Alliance's conclusory presentation, without the attempt to apply the governing law to the circumstances of this case, is inadequate. It is well-settled that a trial court's judgment is presumed correct and conclusory claims of error are deemed to be without foundation and require no discussion by the reviewing court. (*In re S.C.* (2006) 138 Cal.App.4th 396, 408.) It is not our place to construct theories or arguments to undermine the judgment and defeat the presumption of correctness. When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as forfeited. (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785.) We therefore do not address this claim of error on the merits.

### 5.1.3  Appendix A of the Delta Plan

We reject Delta Alliance's contention that Appendix A of the Delta Plan constitutes an unlawful regulation under the APA. Appendix A to the Delta Plan— titled, "The Delta Stewardship Council's Role Regarding Conveyance"— discusses the Council's regulatory authority over conveyance and explains that the Delta Plan does not include any regulatory policies or recommendations regarding conveyance due to the BDCP process that was not complete at the time the plan was issued. We need not recite the Council's reasons for its decision because Appendix A does not fall within the definition of a "regulation" under the APA. Appendix A does not contain a written statement of policy (i.e., a substantive standard) the Council intends to apply generally that predicts how it will decide whether a proposed covered action involving conveyance complies with the Delta Plan. Nor does Appendix A, as Delta Alliance claims, amount to an interpretative regulation. Appendix A does not clarify an existing substantive standard articulated in the Delta Reform Act that the Council is called upon to administer. (See *Alvarado v. Dart Container Corp. of California* (2018) 4 Cal.5th 542, 555-556

(*Alvarado*).) In *Alvarado*, our Supreme Court recently explained, "[A] published enforcement policy that selects among several competing interpretations of the law, that functions, in both intent and practice, as a rule that must be followed prospectively, and that is not announced in the context of resolving a specific case fairly fits within the APA's definition of a 'regulation' [citation]." (*Alvarado*, at p. 556.)

But even if we were to conclude that Appendix A constitutes an interpretative regulation that is invalid because it was not adopted in compliance with the rulemaking procedures of the APA, it does not follow, as Delta Alliance contends, that the Council's decision not to adopt any conveyance regulations based on Appendix A is "void" and should be "set aside" as unlawful. The *Alvarado* court explained, " '[V]oid,' in this context, does not necessarily mean wrong. If the policy in question is interpretive of some governing statute or regulation, a court should not necessarily reject the agency's interpretation just because the agency failed to follow the APA in adopting that interpretation; rather, the court must consider independently how the governing statute or regulation should be interpreted. 'If, when we agreed with an agency's application of a controlling law, we nevertheless rejected that application simply because the agency failed to comply with the APA, then we would undermine the legal force of the controlling law. Under such a rule, an agency could effectively repeal a controlling law simply by reiterating all its substantive provisions in improperly adopted regulations. . . .' " (*Alvarado, supra*, 4 Cal.5th at p. 557.) "[A] court that is exercising its independent judgment should certainly take the agency's interpretation into consideration, having due regard for the agency's expertise and special competence, as well as any reasons the agency may have proffered in support of its interpretation [citation], and if the court is persuaded, it may, of course, adopt the agency's interpretation as its own." (*Id*. at p. 559.)

### 5.2    *Validity of ER P1—Delta Flow Objectives*

Delta Alliance contends that the trial court erred in failing to invalidate ER P1 on the ground that it is arbitrary and capricious because it indisputably fails to advance the statutory mandate of restoring Delta flows as required by sections 85020, subdivision (c) and 85302, subdivision (e)(4).  In other words, Delta Alliance claims that ER P1 is not reasonably necessary to effectuate the purpose of the Delta Reform Act.  We disagree.

In determining whether a regulation is reasonably necessary to effectuate the purpose of the statute, we consider whether the rule is "arbitrary, capricious, or without rational basis."  (*Western States, supra*, 57 Cal.4th at p. 415.)  When making this determination, we " ' " ' "must ensure that an agency has adequately considered all relevant factors, and has demonstrated a rational connection between those factors, the choice made, and the purposes of the enabling statute."  [Citation.]' " ' "  (*Golden Drugs Co., Inc. v. Maxwell–Jolly* (2009) 179 Cal.App.4th 1455, 1466.)

As relevant here, the Delta Reform Act states that it is the policy of California to achieve the following objective, which the Legislature declared is inherent in the coequal goals for management of the Delta:  "Restore the Delta ecosystem, including its fisheries and wildlife, as the heart of a healthy estuary and wetland ecosystem."  (§ 85020, subd. (c).)  The Act mandates that the Delta Plan include subgoals and strategies for restoring a healthy ecosystem, including subgoals and strategies that "[r]estore Delta flows and channels to support a healthy estuary and other ecosystems."  (§ 85302, subd. (e)(4).)  The Act states, in relevant part:  "For the purpose of informing planning decisions for the Delta Plan . . . , the [Water] [B]oard shall, pursuant to its public trust obligations, develop new flow criteria for the Delta ecosystem necessary to protect public trust resources.  In carrying out this section, the board shall review existing water quality objectives and use the best available scientific information.  The flow criteria for the Delta ecosystem shall include the volume, quality, and timing of water necessary for the Delta ecosystem under

different conditions.  The flow criteria shall be developed in a public process by the board within nine months of the enactment of this division."  (§ 85086, subd. (c)(1).)

The Delta Plan explains that human activity—dams, levees, and draining of floodplains, wetlands, and groundwater basins—has harmed the Delta ecosystem by reducing the total quantity of runoff through the Delta toward the ocean and changing the timing of the runoff.  It determined that guaranteeing adequate water flow from the rivers feeding into and through Delta channels is "vital" to restoring the Delta ecosystem.  The Delta Plan states, "To revitalize the Delta ecosystem, . . . adequate seaward flows in Delta channels [must occur] on a schedule more closely mirroring historical rhythms."  It refers to these flows as "more natural, functional flows" and identifies them as a key component of ecosystem restoration.  The Delta Plan explains:  "Flow is a major environmental input that shapes ecological processes, habitat, and biotic composition in riverine and estuarine ecosystems such as the Delta.  Returning to a more naturally variable hydrograph is a key component of ecosystem restoration because the hydrograph works hand-in-hand with habitat restoration to produce diverse and interconnected food webs, refuge options, spawning habitat, and regional food supplies [citation].  Flows should provide species benefits and water supply reliability in the context of current hydrological conditions and degraded habitat."

The Delta Plan concluded that ecosystem "[f]low-related stressors can be reduced or mitigated through improved flow management."  It explains that the Water Board is responsible for setting the minimum seaward flows to be maintained in the Delta channels and the flow standards for the major tributary rivers of the Delta, and that the Water Board was in the process of revising those standards (i.e., flow objectives) at the time the plan was issued.  The Delta Plan recommended deadlines for the revisions (mid-2014 and mid-2018), and stated that the regulations adopted by the Water Board will become elements of the Delta Plan and the Council "can be called upon to review any project that could affect Delta flows in the light of adopted flow criteria," citing ER P1

70

and Ecosystem Restoration Recommendation 1 (ER R1)— titled, "Update Delta Flow Objectives."**30**

The Delta Plan defines "flow criteria" as: "The development of specific criteria by the State Water Resources Control Board for flows for the Delta ecosystem, including the volume, quality, and timing of water necessary for the Delta ecosystem under different conditions (Water Code section 85086(c)(1))." It defines "flow objectives" as: "Where protection of beneficial uses requires specific flow volumes at certain times, regional water quality control boards may establish flow objectives in water quality control plans. They differ from typical water quality objectives in that they are implemented by the State Water Resources Control Board through modifications and limitations of existing or future water rights to make sure these flows are met."

ER P1, which is codified at section 5005 of title 23 of the California Code of Regulations, provides:

"(a) The State Water Resources Control Board's Bay Delta Water Quality Control Plan flow objectives shall be used to determine consistency with the Delta Plan. If and when the flow objectives are revised by the State Water Resources Control Board, the revised flow objectives shall be used to determine consistency with the Delta Plan.

"(b) For purposes of Water Code section 85057.5(a)(3) and section 5001(j)(1)(E) of this Chapter, the policy set forth in subsection (a) covers a proposed action that could significantly affect flow in the Delta."

---

**30** ER R1 provides: "Development, implementation, and enforcement of new and updated flow objectives for the Delta and high-priority tributaries are key to the achievement of the coequal goals. The State Water Resources Control Board should update the Bay Delta Water Quality Control Plan objectives as follows: [¶] (a) By June 2, 2014, adopt and implement updated flow objectives for the Delta that are necessary to achieve the coequal goals. [¶] (b) By June 2, 2018, adopt, and as soon as reasonably possible, implement flow objectives for high-priority tributaries in the Delta watershed that are necessary to achieve the coequal goals." (Fn. omitted.)

We conclude that Delta Alliance has not met its burden to demonstrate that ER P1 is not reasonably necessary to effectuate the purpose of the Delta Reform Act. It has not shown that the Council, in adopting ER P1, disregarded statutory requirements or acted arbitrarily, capriciously, or without a rational basis. To the contrary, the record reflects that the Council acted well within its broad rulemaking authority delegated under the Act to achieve the Legislative goal of restoring the Delta ecosystem through an enforceable regulatory policy designed to achieve adequate Delta flows. In our view, it was certainly rational for the Council to adopt ER P1 to implement the Act's stated goal of restoring Delta flows and channels to support a healthy estuary and other ecosystems. (§ 85302, subd. (e)(4).)

We reject Delta Alliance's unsupported assertion that the Council's decision to adopt ER P1 and ER R1 was arbitrary and capricious because "[t]he Delta flow objectives have still not been updated and the Council knew that there was no possibility the objectives would be updated any time soon when it adopted [ER R1]," which recommends the Water Board update flow objectives for the Delta by-mid 2014 and flow objectives for high-priority tributaries in the Delta watershed by mid-2018. Delta Alliance has transgressed a fundamental appellate rule—that a party must support every factual assertion in a brief with a citation to the record. (Cal. Rules of Court, rule 8.204(a)(1)(C).) An appellate court is entitled to disregard unsupported factual assertions. (*City of Lincoln v. Barringer* (2002) 102 Cal.App.4th 1211, 1239; see *Mueller v. County of Los Angeles* (2009) 176 Cal.App.4th 809, 816, fn. 5 ["The claimed existence of facts that are not supported by citations to pages in the appellate record, or not appropriately supported by citations, cannot be considered by this court."].)[31]

---

[31] Delta Alliance's combined opening brief/response brief, in addition to raising the claims of error discussed above in the cross-appeal section, urges us to affirm a number of the trial court's holdings in the response section. With respect to performance measure

**THE FEES CASE**

C-WIN contends the trial court erred in substantially reducing the amount of attorney fees it requested under Code of Civil Procedure section 1021.5 (hereafter section 1021.5). In its cross-appeal, the Council does not dispute C-WIN's entitlement to attorney fees under section 1021.5. Rather, it contends the trial court erred in applying a 1.5 multiplier to the lodestar in calculating the fee award.[32] We find no error.

## 1.0    Additional Background

In September 2013, C-WIN filed a first amended verified petition for writ of mandate and complaint for declaratory and injunctive relief. Among other things, it alleged causes of action under the Delta Reform Act and CEQA.

In July 2014, the trial court issued a case management order, which authorized the petitioners to file joint briefs and to incorporate by reference all or portions of other petitioners' briefs. The order stated: "Any portion incorporated by reference in a brief

---

targets, Delta Alliance asserts that, even though the trial court did not rely on the APA in concluding that the Delta Plan's performance measure targets must be adopted as regulations, the trial court's ruling should be affirmed on this independent basis. We decline to address this issue. First, the record does not reflect that it was raised below. "It is axiomatic that arguments not raised in the trial court are forfeited on appeal." (*Kern County, supra*, 209 Cal.App.4th at p. 1038.) The trial court's order makes no mention of this issue, and Delta Alliance's trial brief does not include such an argument although it incorporates by reference arguments made by the petitioners in *C-WIN/CDWA*, *North Coast*, and *City of Stockton*. None of the briefs incorporated by reference raise the specific argument discussed here. Second, the performance measure targets in the original Delta Plan have been superseded by the Delta Plan Amendments and are currently the subject of multiple new lawsuits. The trial court should address the validity of the performance measure targets in the first instance.

[32] The Council has filed a motion asking us to take judicial notice of various documents it claims are relevant to the appeals filed in the fees case. We deny the request, as none of the documents are necessary to our resolution of the issues before us. (*Jordache Enterprises, Inc. v. Brobeck, Phleger & Harrison* (1998) 18 Cal.4th 739, 748, fn. 6 [declining to take judicial notice of materials not "necessary, helpful, or relevant"].)

shall count for all purposes as if the incorporated portion were set forth in full in the incorporating party's brief, except toward page limits."

In October 2014, C-WIN and CDWA filed a 79-page joint merits brief, which included 13 arguments claiming the Delta Plan was deficient, multiple arguments claiming the PEIR for the Delta Plan violated CEQA, and several arguments claiming the Council violated the APA in adopting the Delta Plan regulations. The brief also incorporated by reference the merits briefs filed by the petitioners in *North Coast Rivers Alliance, et al. v. Delta Stewardship Council* (Sacramento Super. Ct. case No. 34-2013-80001534), *Save the California Delta Alliance v. Delta Stewardship Council* (San Francisco Super. Ct. case No. CPF-13-513049), and *Stockton v. Delta Stewardship Council* (San Joaquin Super. Ct. case No. 39-2013-00298188-CU-WM-STK).

In May 2016, the trial court issued a written order granting in part and denying in part C-WIN's petition. In doing so, the court rejected 12 of the 13 arguments made in C-WIN's merits brief claiming the Delta Plan was deficient. The only argument the court did not reject was the claim that the Delta Plan violated Water Code section 85304 by failing to promote options for new and improved infrastructure relating to the water conveyance in the Delta, storage systems, and for the operation of both to achieve the coequal goals. In response to the Council's motion for clarification, the trial court stated that the Council could satisfy the requirements of Water Code section 85304 by either adopting regulations or recommendations. As previously discussed, the court did not reach the merits of any CEQA claim, reasoning that because the Delta Plan was invalid, there was no longer a proposed project with a PEIR to review for compliance with CEQA. The court explained, "The Court does not believe that piece-meal CEQA review is feasible under circumstances in which significant [Delta] Plan revisions are required. [¶] Because [the Council] must comply with its CEQA obligations following completion of a revised Delta Plan, Petitioners will have the opportunity to file CEQA challenges to this new certified document. Consequently, no party is deprived of the opportunity to

74

present challenges to the [P]EIR at such time as a final project (Delta Plan) has been properly approved."

After judgment was entered,[33] C-WIN filed a motion for attorney fees and costs under section 1021.5. C-WIN sought $1,440,713 in attorney fees and costs, which included a request to apply a 2.0 multiplier to the lodestar. The Council opposed the motion on various grounds, including that C-WIN was not entitled to the amount of fees requested because it did not achieve its litigation objectives, as it was unsuccessful on 12 of its 13 arguments claiming the Delta Plan was deficient and only won a de minimis victory on its water conveyance claim. The Council further argued that a multiplier was not warranted, C-WIN requested an unreasonable hourly rate of $600 per hour for two attorneys, and C-WIN was not entitled to recover fees for time spent on CEQA issues. The Council also pointed out that C-WIN was improperly attempting to "qualify for fees" by claiming credit for work performed by other petitioners on the performance measure targets issue. The Council noted that C-WIN incorporated by reference the arguments made by other petitioners and did not contribute anything of substance to this issue.

In its tentative ruling, the trial court found that C-WIN was entitled to recover attorney fees under section 1021.5 but that the appropriate amount of the fee award was significantly less than the requested amount of $1,440,713. In so finding, the court agreed with the Council that the requested fee award should be reduced by 12/13ths to reflect that C-WIN was unsuccessful on the majority of its "arguments/claims." The court also agreed with the Council that the requested fee award should be reduced because the $600 hourly rate C-WIN sought for two attorneys was unreasonable, and because the court never reached the merits of any CEQA claim. The court, however,

---

[33] The judgment entered in favor of C-WIN included the relief it obtained regarding the promotion of options relating to water conveyance in the Delta and storage systems as well as the relief obtained by the other petitioners regarding performance measure targets.

disagreed with the Council that C-WIN's success was de minimis. It also disagreed that a multiplier was not warranted; it concluded that a multiplier of 1.5 was appropriate. After calculating the lodestar, applying the 1.5 multiplier, and adding costs and post-judgment fees, the court awarded C-WIN $94,698.33.

At the hearing on the motion, C-WIN stated that the main issue it wanted to address was its success in achieving its litigation objectives. According to C-WIN, it achieved "near complete success" on its Delta Reform Act cause of action because the court set aside the Delta Plan with directions for the Council to "consider conveyance options," which was "the heart of the concern [it] had with the Delta Plan." C-WIN also claimed that it had achieved success on the performance measure targets issue because it adopted by reference the successful arguments made by other petitioners. C-WIN recognized that the trial court had discretion to adjust the requested fee award based on its level of success but argued that the important factor in deciding the proper award was whether it achieved its litigation objectives. C-WIN asserted that because all of its unsuccessful arguments were "so intertwined, so intimately related to the successful argument," it achieved "full success" on its Delta Reform Act cause of action.

The Council disagreed, arguing that a reduction in the requested fee award was appropriate because C-WIN's "loss was overwhelming." The Council pointed out that C-WIN had lost 12 of its 13 arguments claiming the Delta Plan was deficient, and that C-WIN only obtained a "technical win" on the conveyance issue because it failed to achieve its main objective of requiring the Council to adopt a regulation. In response, C-WIN did not dispute that it sought an order requiring the Council to adopt a regulation regarding conveyance. Instead, C-WIN stated, "It's true that there were many, many things that we asked for that we didn't get, but we did get the central objective that we wanted to focus on, which is . . . effectively promoting conveyance alternatives in the revised [Delta] plan . . . . Couldn't be happier with that part of the ruling, and we see that as very far from a technical win but as a central objective." C-WIN claimed that it was "pretty

76

happy" with the court's ruling on conveyance, and that to characterize its achievement on the issue as an "insignificant technical win . . . is approaching absurdity." The Council countered by asserting that C-WIN's trial brief and fee motion demonstrate that conveyance was not the central purpose of its lawsuit, noting that the fee motion did not even mention conveyance.

Following the hearing, the trial court adopted the tentative ruling as the final ruling.

## 2.0 General Legal Principles and Standard of Review

Section 1021.5 is an exception to the general rule that parties in litigation pay their own attorney fees. (*Friends of Spring Street v. Nevada City* (2019) 33 Cal.App.5th 1092, 1107 (*Friends of Spring Street*).) " 'Derived from the judicially crafted "private attorney general doctrine" [citation], section 1021.5 is aimed at encouraging litigants to pursue meritorious public interest litigation vindicating important rights and benefitting a broad swath of citizens, and it achieves this aim by compensating successful litigants with an award of attorney's fees [citations].' [Citation.] The intent of section 1021.5 fees is not 'to punish those who violate the law but rather to ensure that those who have acted to protect public interest will not be forced to shoulder the cost of litigation.' " (*Id.* at p. 1107.) The purpose of section 1021.5 is to "financially reward attorneys who successfully prosecute cases in the public interest, and thereby ' "prevent worthy claimants from being silenced or stifled because of a lack of legal resources." ' " (*Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 568 (*Graham*).)

Section 1021.5 authorizes an award of attorney fees to a "successful party . . . in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement . . . are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any." Under

section 1021.5, the "successful party" is generally the "prevailing" party, that is, " 'the party that " ' "succeed[s] on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." ' [Citation.]" ' [Citation.] 'The party seeking attorney fees need not prevail on all its claims alleged in order to qualify for an award.' " (*McGuigan v. City of San Diego* (2010) 183 Cal.App.4th 610, 625; see *Friends of Spring Street, supra,* 33 Cal.App.5th at p. 1108 ["The 'successful party' under section 1021.5 is 'the party to litigation that achieves its objectives.' "].)

When a party is entitled to attorney fees under section 1021.5, the amount of the award is determined by the lodestar-multiplier method. (See *Graham, supra,* 34 Cal.4th at p. 579.) A court applies the lodestar-multiplier method to calculate fees " 'by multiplying the number of hours reasonably expended by counsel by a reasonable hourly rate. Once the court has fixed the lodestar, it may increase or decrease that amount by applying a positive or negative "multiplier" to take into account a variety of other factors, including the quality of the representation, the novelty and complexity of the issues, the results obtained, and the contingent risk presented.' " (*Laffitte v. Robert Half Internat. Inc.* (2016) 1 Cal.5th 480, 489.) The lodestar is intended to reflect the reasonable, necessary hours expended and may therefore diverge from the attorney's actual time records. (*Concepcion v. Amscan Holdings, Inc.* (2014) 223 Cal.App.4th 1309, 1320.)

"The party seeking attorney fees has the burden of proving that the litigation warranted an award of attorney fees and that the hours expended and the fees sought were reasonable. [Citation.] Once the trial court has found, as the court did in this case, that the litigation conferred a public benefit warranting an award of attorney fees, the amount of fees to be awarded under section 1021.5 is within the trial court's discretion. [Citation.] The party seeking fees has the burden to prove that the trial court abused its discretion in awarding less than the amount it sought." (*Save Our Uniquely Rural Community Environment v. County of San Bernardino* (2015) 235 Cal.App.4th 1179, 1184 (*SOURCE*).)

78

"Under the abuse of discretion standard, a trial court's ruling will not be disturbed unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. [Citation.] Abuse of discretion review ' "asks in substance whether the ruling in question 'falls outside the bounds of reason' under the applicable law and the relevant facts [citations]." ' [Citation.] The trial court's ruling will not be reversed if reasonable people could disagree as to the proper outcome." (*SOURCE, supra*, 235 Cal.App.4th at p. 1184.)

**3.0    C-WIN**

3.1    *Limited Success*

C-WIN contends the trial court erred in reducing the requested fee award based on limited success. According to C-WIN, the court's reduction of the award by 12/13ths was inconsistent with the substantive law of section 1021.5 and, in any event, an abuse of discretion. We disagree.

California law, like federal law, considers the extent of a prevailing party's success a crucial factor in determining the amount of a fee award. (*Chavez v. City of Los Angeles* (2010) 47 Cal.4th 970, 989 (*Chavez*); *Hensley v. Eckerhart* (1983) 461 U.S. 424, 434 [76 L.Ed.2d 40, 51] (*Hensley*) [the results obtained factor is particularly crucial where a plaintiff is deemed prevailing even though he only succeeded on some of his claims for relief].) Indeed, the degree or extent of the prevailing party's success in obtaining the results which he sought must be taken into consideration in determining the extent of attorney fees which it would be reasonable for him to recover. (*Sokolow v. County of San Mateo* (1989) 213 Cal.App.3d 231, 248; *SOURCE, supra,* 235 Cal.App.4th at p. 1185 ["the extent of a party's success is a key factor in determining the reasonable amount of attorney fees to be awarded under section 1021.5"].)

"We apply a two-step inquiry in analyzing whether section 1021.5 fees are appropriate where a plaintiff achieves limited success. [Citation.] The first step is to determine whether the prevailing party's successful and unsuccessful claims are related.

79

[Citation.]  'If the different claims are based on different facts and legal theories, they are unrelated; if they involve a common core of facts or are based on related legal theories, they are related.' "  (*Sweetwater Union High School Dist. v. Julian Union Elementary School Dist.* (2019) 36 Cal.App.5th 970, 996-997 (*Sweetwater*).)  " 'Under this analysis, an unsuccessful claim will be *un*related to a successful claim when the relief sought on the unsuccessful claim is intended to remedy a course of conduct entirely distinct and separate from the course of conduct that gave rise to the injury on which the [successful claim] is premised.' "  (*Harman v. City and County of San Francisco* (2006) 136 Cal.App.4th 1279, 1311.)  "If a plaintiff has prevailed on some claims but not others, fees are not awarded for time spent litigating claims unrelated to the successful claims . . . ."  (*Chavez, supra,* 47 Cal.4th at p. 989; see *Hensley, supra*, 461 U.S. at p. 435 [work on an unsuccessful and unrelated claim "cannot be deemed to have been 'expended in pursuit of the ultimate result achieved' . . . and therefore no fee may be awarded for services on the unsuccessful claim" (fn. omitted)].)

If successful and unsuccessful claims are related, the court proceeds to the second step of the inquiry, which requires the trial court to evaluate the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.  (*Sweetwater, supra*, 36 Cal.App.5th at p. 997.)  "Full compensation may be appropriate where the plaintiff has obtained 'excellent results,' but may be excessive if 'a plaintiff has achieved only partial or limited success.'  [Citation.]  'The court may appropriately reduce the lodestar calculation "if the relief, however significant, is limited in comparison to the scope of the litigation as a whole." '  [Citation.]"  (*Environmental Protection Information Center v. Department of Forestry & Fire Protection* (2010) 190 Cal.App.4th 217, 239.)  In conducting the analysis at the second step of the inquiry, " 'the most critical factor is the degree of success obtained.' "  (*Harman v. City and County of San Francisco* (2007) 158 Cal.App.4th 407, 418.)  A court may identify specific hours

that should be eliminated or simply reduce the award to account for the limited success. (*Ibid*.)

We conclude that C-WIN has not met its burden to demonstrate that the trial court erred in reducing the requested fee award based on limited success. As discussed above, the Council argued in the trial court that a substantial reduction of the requested fee award was warranted because C-WIN was unsuccessful on 12 of its 13 arguments claiming the Delta Plan was deficient. In response, C-WIN did not dispute that the trial court rejected nearly all of its arguments regarding the sufficiency of the Delta Plan but claimed that the requested fee award was appropriate because it achieved its litigation objective with respect to its Delta Reform Act cause of action—vacating and setting aside the Delta Plan and applicable regulations. C-WIN argued that the Council's limited success theory was not a proper basis to reduce the fee award because it obtained an excellent result, and the court's rejection of certain grounds for vacating the Delta Plan was an insufficient reason for reducing the award. At the hearing on the motion, C-WIN argued for the first time that because all of its unsuccessful arguments were "so intertwined, so intimately related to the successful argument," it achieved "full success" on its Delta Reform Act cause of action.

We reject C-WIN's contention that its unsuccessful arguments for setting aside the Delta Plan were related to its successful argument. C-WIN's unsuccessful arguments sought to set aside the Delta Plan for specific deficiencies unrelated to its successful argument regarding water conveyance in the Delta. The unsuccessful arguments were not merely different legal theories attempting to achieve the same result as the successful argument. Rather, the unsuccessful arguments intended to remedy alleged deficiencies in the Delta Plan entirely distinct and separate from the deficiency on which its successful argument was premised. Therefore, we find no error in the trial court's determination that C-WIN was not entitled to recover fees for the time spent on arguments unrelated to its successful argument. Moreover, even if we agreed with C-WIN that its unsuccessful

81

arguments were related to its successful argument, the trial court acted well within its discretion in reducing the requested fee award to account for C-WIN's limited success in comparison to the scope of the litigation as a whole. The record discloses that C-WIN's litigation objectives with respect to its Delta Reform Act cause of action included invalidating the Delta Plan on numerous independent grounds and that it directly succeeded only in invalidating the Delta Plan on one of those grounds. Contrary to C-WIN's contention at the hearing on the fee motion, the allegations in its petition do not disclose that it achieved its "central objective" of invalidating the Delta Plan for failing to promote options for water conveyance in the Delta. Nowhere in C-WIN's petition does it allege that the Delta Plan was deficient for violating Water Code section 85304. The allegations in C-WIN's petition related to water conveyance involve the BDCP and claim that the Council's actions regarding this conveyance option violated CEQA in various ways. Further, a fair reading of C-WIN's merits brief does not support C-WIN's contention that the Delta Plan's failure to promote options for water conveyance was "the heart of the concern [it] had with the Delta Plan." C-WIN devoted 34 pages of its merits brief to arguing that the Delta Plan was deficient. Four of those pages discuss the issue of water conveyance and nothing in the brief suggests that this issue was more important than any of the other 12 arguments claiming the Delta Plan was deficient.

We are unpersuaded by C-WIN's contention that the trial court abused its discretion by failing to consider the litigation objectives disclosed in its petition. According to C-WIN, the trial court erred in reducing the requested fee award because it "obtained precisely what [it] sought" in filing this action; namely, "the determination of the invalidity of the adopted Delta Plan, and the Judgment and Writ requiring the Council to revise the Delta Plan to include quantified or otherwise measurable targets associated with achieving reduced Delta Reliance and a flow policy including quantified or otherwise measurable targets." Nothing in the record indicates that the trial court did not consider the litigation objectives disclosed in C-WIN's petition. While C-WIN's petition

reveals that it sought to invalidate the Delta Plan based on its failure to include performance measure targets as required by the Delta Reform Act, C-WIN never claimed in the trial court that it spent any time briefing the merits of this issue or otherwise contributed to the successful result achieved by the other petitioners on this issue. Instead, C-WIN acknowledged, as it does on appeal in its opening brief, that its merits brief simply incorporated by reference the arguments made by other petitioners.[34] A trial court has the discretion to "consider the relative contributions of multiple private attorneys general when it exercises its discretion to determine the proper amount of an attorneys' fee award." (*City of Santa Monica v. Stewart* (2005) 126 Cal.App.4th 43, 88; see *In re State Water Resources Control Bd. Cases* (2008) 161 Cal.App.4th 304, 319, fn. 8 [explaining that in situations involving coordinated cases, and thus multiple judgments, the trial court must fairly weigh the extent to which the services of the parties contributed to the success achieved in their action, not just the success achieved in the coordinated actions as a whole].) C-WIN has not met its burden to establish that the trial court abused its discretion by basing its fee award on the success of the arguments C-WIN briefed on the merits. In determining the extent of a prevailing party's success in obtaining the results which it sought, a court considers the relief obtained compared to the party's litigation objectives as disclosed by the pleadings, trial briefs, opening statements, and similar sources. (See *Hsu v. Abbara* (1995) 9 Cal.4th 863, 876.)

---

[34] In its reply brief, C-WIN argues for the first time that it "consistently and forcefully advanced its arguments regarding the Delta Plan's 'performance measures' throughout this litigation." We will not consider this argument because it was not raised in the trial court and is inconsistent with the position C-WIN took in the trial court. (*Mattco Forge, Inc. v. Arthur Young & Co.* (1997) 52 Cal.App.4th 820, 847; *Sommer v. Gabor* (1995) 40 Cal.App.4th 1455, 1468.) On a related matter, we grant the Council leave to file its proposed response to allegations of misrepresentation made against it in C-WIN's reply brief.

Finally, we reject C-WIN's contention that the trial court erred in reducing the requested fee award because seven of the 13 arguments raised in its merits brief regarding the sufficiency of the Delta Plan were based on theories it did not allege in its petition. In other words, C-WIN argues that the trial court improperly reduced the requested fee award because seven of the 13 arguments rejected by the court were based solely on theories CDWA alleged in its petition.[35] C-WIN forfeited this argument by failing to raise it in the trial court. " 'It is axiomatic that arguments not asserted below are waived and will not be considered for the first time on appeal.' " (*Martinez v. Scott Specialty Gases, Inc.* (2000) 83 Cal.App.4th 1236, 1249 (*Martinez*); see *Easterby v. Clark* (2009) 171 Cal.App.4th 772, 783, fn. 7 (*Easterby*).) This argument also fails because it is inconsistent with the position C-WIN took in the trial court. (*Brown v. Boren* (1999) 74 Cal.App.4th 1303, 1316 ["a litigant may not change his or her position on appeal and assert a new theory"]; *Fontana v. Upp* (1954) 128 Cal.App.2d 205, 211 ["Where parties have taken a certain position during the trial, they cannot adopt a different position on appeal by raising a new issue which the other party was not apprised of at the trial."].) The joint brief filed by C-WIN and CDWA does not specify that certain arguments only pertained to one of the petitioner groups. Rather, it is captioned as a joint brief on the merits in support of the petitions filed by C-WIN and CDWA. At the hearing on the fee motion, C-WIN represented that its litigation priorities were reflected in its merits brief. C-WIN did not dispute that it had "brought thirteen arguments" and only "won on one of

---

[35] We are somewhat mystified by this argument. As indicated, C-WIN's petition does not include the theory that the Delta Plan was deficient for violating Water Code section 85304 by failing to promote options for new and improved infrastructure relating to the water conveyance in the Delta, storage systems, and for the operation of both to achieve the coequal goals. Thus, if we were to accept C-WIN's suggestion that the fee award should be determined solely by the specific theories for relief alleged in its petition, the trial court's decision to award C-WIN attorney fees would be subject to reversal. For the reasons we discuss, including forfeiture, we need not decide this issue.

them." C-WIN conceded that "there were many, many things that [it] asked for that [it] didn't get." At no point did C-WIN make the argument it now advances on appeal; namely, that the fee award should not have been reduced by 12/13ths because it did not seek to invalidate the Delta Plan on each of the 13 grounds raised in its merits brief.

3.2     *CEQA*

C-WIN contends that the trial court's refusal to award fees for hours expended on its CEQA cause of action was inconsistent with the substantive law of section 1021.5 and was an abuse of discretion. We disagree.

C-WIN has not met its burden to demonstrate that reversal is warranted. At the hearing on the fee motion, C-WIN conceded that it did not achieve its litigation objective with respect to its CEQA cause of action—decertification of the PEIR. As discussed above, the trial court did not reach the merits of any alleged CEQA violation in view of its order vacating and setting aside the Delta Plan and any applicable regulations based on violations of the Delta Reform Act. After the trial court issued this order, the parties stipulated that all CEQA claims would be preserved, regardless of the outcome of the merits appeals, and could be "re-plead[ed] or resurrect[ed] . . . at a later date," i.e., after the Council amended the Delta Plan and any applicable regulations and certified a PEIR for the amendments.[36] The documents subject to judicial notice reflect that C-WIN is currently challenging the Delta Plan Amendments and the PEIR for the Delta Plan Amendments in a new lawsuit. We are not persuaded by C-WIN's suggestion that the trial court improperly reduced the requested fee award because its CEQA cause of action

---

[36] As part of the judgments entered below, the parties agreed that, "To the extent [the Council] relies on the 2013 Program EIR in the future, [the Council] shall—as part of that reliance—adopt new CEQA findings and recertify the 2013 Program EIR along with taking action on any other CEQA documentation it deems appropriate. [The Council] shall also file a CEQA Notice of Determination that reflects the full extent of this reliance."

was an alternative legal ground for its desired outcome—invalidation of the Delta Plan. C-WIN's CEQA cause of action is an entirely distinct and separate claim from its Delta Reform Act cause of action. It is based on different facts and legal theories and seeks different relief.

### 3.3 *Catalyst Theory*

C-WIN contends that it was entitled to the requested fee award under the "catalyst theory" because the Council "altered its behavior after, and in part, because of, [C-WIN's] lawsuit and Judgment," as evidenced by the adoption of the Delta Plan Amendments. According to C-WIN, it is a successful party under the catalyst theory because the Delta Plan Amendments promote conveyance options and include quantified or otherwise measurable performance measure targets. We disagree.

C-WIN forfeited this argument by not raising it in the trial court. (*Martinez, supra*, 83 Cal.App.4th at p. 1249; see *Easterby, supra,* 171 Cal.App.4th at p. 783, fn. 7.) In any event, the argument lacks merit. "The catalyst theory provides that a plaintiff is successful for purposes of an attorney fee award under . . . section 1021.5, despite the lack of a favorable judgment or other court action, if the lawsuit was a catalyst in motivating the defendant to provide the primary relief sought." (*Garcia v. Bellflower Unified School Dist. Governing Bd.* (2013) 220 Cal.App.4th 1058, 1066; *Lyons v. Chinese Hospital Assn.* (2006) 136 Cal.App.4th 1331, 1346 [issue in catalyst cases " 'is whether a party who has not obtained *any* judicial relief is nevertheless entitled to fees' "].) Here, C-WIN obtained a favorable judgment. The trial court granted its petition in part, invalidating the Delta Plan because it failed to promote options for water conveyance and storage systems in violation of Water Code section 85304. The judgment entered in favor of C-WIN includes the relief it obtained as well as the relief obtained by the other petitioners in this coordinated action, including a writ of mandate commanding the Council to revise the Delta Plan and any applicable regulations to

include quantified or otherwise measurable performance measure targets. Thus, this is not a catalyst case and C-WIN's reliance on such cases is misplaced. (*Lyons,* at p. 1347.)

## 4.0    The Council

The Council contends that reversal of the fee order is required because the trial court abused its discretion in failing to "state a rational basis" for applying a 1.5 multiplier to the lodestar. The Council requests we remand this matter to the trial court with directions to eliminate the multiplier or articulate a basis for it. We find no basis for reversal.

The Council forfeited its claim of error by failing to object to the tentative decision. "[W]hen a trial court announces a tentative decision, a party who failed to bring any deficiencies or omissions therein to the trial court's attention forfeits the right to raise such defects or omissions on appeal." (*Porterville Citizens for Responsible Hillside Development v. City of Porterville* (2007) 157 Cal.App.4th 885, 912 (*Porterville Citizens*).) "The purpose of [the forfeiture] rule is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected." (*In re S.B.* (2004) 32 Cal.4th 1287, 1293.) "It is unfair to the trial judge and the adverse party to attempt to take advantage of an alleged error or omission on appeal when the error or omission could have been, but was not, brought to the attention of the trial court in the first instance." (*Porterville Citizens,* at p. 912.) Here, the record discloses that the Council's claim of error was not raised in the trial court. The Council made no mention of this issue at the hearing on the fee motion.

But even if the claim was preserved for appeal, the Council has failed to establish reversible error. "[T]he lodestar is the basic fee for comparable legal services in the community; it may be adjusted by the court based on factors including . . . (1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, [and] (4) the contingent nature of the fee award. [Citation.] The purpose of such

adjustment [or multiplier] is to fix a fee at the fair market value for the particular action. In effect, the court determines, retrospectively, whether the litigation involved a contingent risk or required extraordinary legal skill justifying augmentation of the unadorned lodestar in order to approximate the fair market rate for such services. The ' "experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong." ' " (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1132 (*Ketchum*).)

C-WIN's fee motion sought a 2.0 multiplier based on the "contingency risk" factor, which is "[o]ne of the most common fee enhancers" and an important consideration in the multiplier analysis. (*Graham, supra,* 34 Cal.4th at p. 579; see *Ketchum, supra,* 24 Cal.4th at p. 1138 [explaining that a multiplier for contingent risk "is intended to approximate market-level compensation for such services, which typically includes a premium for the risk of nonpayment or delay in payment of attorney fees"].) In response to the motion, the Council argued that a multiplier was not warranted because (1) only one of the C-WIN attorneys represented a client on a contingency basis, (2) C-WIN failed to cite any authority awarding a multiplier greater than 1.5 "purely on the basis of contingency," (3) C-WIN did not achieve its litigation objectives, and (4) the burden of the multiplier would be borne by the taxpayers.

A review of the tentative ruling reveals that the trial court was aware of its discretion to apply a multiplier. It also reveals that the court was aware of the factors justifying a multiplier and considered them in concluding that a 1.5 multiplier was appropriate. In so concluding, the court acknowledged that "some of the work [by the attorneys for the C-WIN petitioners] may not have been done on contingency." On this record, the Council has failed to carry its burden to establish that the court's decision to apply a 1.5 multiplier fell outside the court's wide discretion. The Council has not convinced us that the court was clearly wrong. We disagree with the Council that the

court's failure to explain its specific reasons for applying a 1.5 multiplier requires reversal. "[W]e cannot reverse an attorney fee award solely for lack of an explanation by the trial court. We can reverse only if the record contains some indication that the trial court considered improper factors or did, indeed, simply snatch its award 'from thin air.'" (*SOURCE, supra*, 235 Cal.App.4th at pp. 1189-1190.) No such indication appears here.

## DISPOSITION

In the merits case, the judgments in the following matters are reversed to the extent the trial court concluded that the Council violated the Delta Reform Act by failing to adopt, as legally enforceable regulations, performance measure targets to achieve certain objectives of the Act: *North Coast Rivers Alliance, et al. v. Delta Stewardship Council* (Sacramento Super. Ct. case No. 34-2013-80001534); *California Water Impact Network, et al. v. Delta Stewardship Council* (San Francisco Super. Ct. case No. CPF-13-513047); *Central Delta Water Agency, et al. v. Delta Stewardship Council* (San Francisco Super. Ct. case No. CPF-13-513048); and *Save the California Delta Alliance v. Delta Stewardship Council* (San Francisco Super. Ct. case No. CPF-13-513049). These matters are remanded to the superior court with directions to dismiss the portions that have become moot. The reversal on the grounds of mootness does not imply that the judgments were erroneous on the merits as to the moot portions, but is solely for the purpose of returning jurisdiction to the superior court so that it can vacate portions of otherwise final judgments. In all other respects, the judgments entered in each of the six coordinated cases before us are affirmed.

In the fees case, the trial court's fee order is affirmed.  The Council is awarded its costs on appeal in this consolidated matter.  (Cal. Rules of Court, rule 8.278(a)(1), (2).)


/s/_____
BUTZ, J.



We concur:



/s/_____
RAYE, P. J.



/s/_____
HULL, J.

90

CERTIFIED FOR PARTIAL PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| | C082944 & C086199 |
| | (JCCP No. 4758; Sacramento Super. Ct. case Nos. 34-2013-80001500, 34-2013-80001530, 34-2013-80001534; San Francisco Super. Ct. case Nos. CPF-13-513047; CPF-13-513048, CPF-13-513049.) |
| DELTA STEWARDSHIP COUNCIL CASES. | ORDER MODIFYING OPINION AND CERTIFYING OPINION FOR PARTIAL PUBLICATION |
| | [NO CHANGE IN JUDGMENT] |

APPEAL from a judgment of the Superior Court of Sacramento County, Michael P. Kenny, Judge. Affirmed in part and reversed in part.

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of the Discussion entitled "THE FEES CASE."

1

Best Best & Krieger, Charity Schiller, Stefanie Morris, Jennifer Lynch for Plaintiffs and Appellants State Water Contractors, Alameda County Flood Control and Water Conservation District Zone 7, and San Bernardino Valley Municipal Water District.

Marcia L. Scully, Adam C. Kear, Robert C. Horton, and Stefanie Morris for Plaintiff and Appellant The Metropolitan Water District of Southern California.

Brunick, McElhaney & Kennedy, William J. Brunick, and Leland McElhaney for Plaintiffs and Appellants Mojave Water Agency and Antelope Valley-East Kern Water Agency.

Stanly T. Yamamoto, District Counsel, and Anthony T. Fulcher, Assistant District Counsel for Plaintiff and Appellant Santa Clara Valley Water District.

Kronick, Moskovitz, Tiedemann & Girard, Daniel J. O'Hanlon, Rebecca Harms, and Carissa M. Beecham for Plaintiffs and Appellants San Luis & Delta-Mendota Water Authority and Westlands Water District.

Pioneer Law Group, Andrea A. Matarazzo; and Jon D. Rubin, General Counsel for Plaintiff and Appellant Westlands Water District.

Rebecca R. Akroyd, General Counsel for Plaintiff and Appellant San Luis & Delta-Mendota Water Authority.

Freeman Firm, Thomas H. Keeling; Law Office of John H. Herrick, John H. Herrick; Mohan, Harris, Ruiz, Wortmann, Perisho & Rubino, S. Dean Ruiz; Nomellini, Grilli & McDaniel, Dante John Nomellini, Dante John Nomellini, Jr., and Daniel A. McDaniel for Plaintiffs and Appellants Central Delta Water Agency, South Delta Water Agency, Lafayette Ranch, Inc., and Cindy Charles.

Michael B. Jackson for Plaintiffs and Appellants California Sportfishing Protection Alliance, California Water Impact Network, and AquAlliance, Friends of the River and Restore the Delta.

Soluri Meserve and Osha R. Meserve for Plaintiff and Appellant Local Agencies of the North Delta.

E. Robert Wright for Plaintiff and Appellant Friends of the River.

John Buse for Plaintiff and Appellant Center for Biological Diversity.

2

Law Offices of Michael A. Brodsky and Michael A. Brodsky for Plaintiff and Appellant Save the California Delta Alliance.

Xavier Becerra, Attorney General, Daniel A. Olivas, Assistant Attorney General, Deborah M. Smith, Supervising Deputy Attorney General, Jeremy Brown, Daniel L. Siegel, Matthew Struhar, Deputy Attorneys General; Shute, Mihaly & Weinberger, Ellen J. Garber, Gabriel M.B. Ross, and Sarah H. Sigman for Defendants and Appellants Delta Stewardship Council.

Law Offices of Stephan C. Volker, Stephan C. Volker, and Alexis E. Krieg for Plaintiffs and Respondents North Coast Rivers Alliance, Pacific Coast Federation of Fishermen's Associations, San Francisco Crab Boat Owners Association, and Winnemem Wintu Tribe.


THE COURT:

It is ordered that the opinion filed herein on April 10, 2020, be modified as follows:

On page 5, the paragraph immediately preceding the heading "FACTUAL AND PROCEDURAL BACKGROUND" is deleted and is replaced with the following paragraph:

In the merits case, we are asked to consider the validity of the trial court's rulings on legal challenges to the Delta Plan and Delta Plan regulations. The challenges based on violations of the Delta Reform Act can generally be summarized as asserting overregulation or under regulation by the Council in violation of the Act. In the fee case, we are asked to consider the validity of the trial court's attorney fee order. For the reasons stated below, in the published portion of this opinion we agree with the Council that the trial court erred in finding that it violated the Act by failing to adopt, as legally enforceable regulations, performance measure targets to achieve certain objectives of the Act. We also agree with the Council that the remaining issues raised in its appeal regarding the statutory

3

violations found by the trial court have become moot due to the adoption of amendments to the Delta Plan.  In the unpublished portion of this opinion we find no error in the fee award and therefore affirm the trial court's fee order.  In view of our mootness determination, we will reverse and remand the judgments entered in the four cases appealed by the Council in the merits case.  These matters will be remanded to the superior court with directions to dismiss the portions that have become moot.  In all other respects, we will affirm the judgment entered in each of the six coordinated cases before us in the merits case.

The opinion in the above-entitled matter was not certified for publication in the Official Reports.  For good cause it now appears that the opinion should be partially published in the Official Reports with the exception of the Discussion entitled "THE FEES CASE," and it is so ordered.

This modification does not change the judgment.

FOR THE COURT:


 /s/ 
RAYE, P. J.


 /s/ 
HULL, J.


 /s/ 
BUTZ, J.


4